MOLLY A.[1] *vs.* COMMISSIONER OF THE DEPARTMENT OF
MENTAL RETARDATION.

No. 06-P-206.

Suffolk. October 18, 2006. - June 5, 2007.

Present: RAPOZA, C.J., LAURENCE, & GREEN, JJ.[2]

*Administrative Law,.* Agency's interpretation of statute. *Department of Mental Retardation. Mentally Retarded Person. Due Process of Law,* Mental health. *Statute,* Construction.

In a civil action for declaratory and injunctive relief brought by the parents of a severely disabled and retarded young woman, seeking to prevent the Department of Mental Retardation (DMR) from transferring their then twenty-two year old daughter from her long-time residential placement at a rehabilitation center in New Hampshire to another facility in Massachusetts, the judge properly granted summary judgment in favor of the DMR on the plaintiffs' claims that the transfer statute, G. L. c. 123B, §§ 1-3, required the DMR to prove in an administrative hearing that the daughter's adult placement would meet her best interest, and to provide the daughter with an individual service plan within ninety days of her twenty-second birthday, where the provisions of the turning twenty-two statute, G. L. c. 71B, §§ 12A-12C, instead applied to the daughter's transfer, and the DMR proceeded properly under that statute and the DMR's regulations [277-284, 286-287]; however, the judge erred in granting summary judgment on the count of the complaint alleging that the DMR did not comply with its obligations under the turning twenty-two statute, where the issue whether the placements proposed by the DMR would provide the habilitative services necessary to insure the daughter's physical well-being and safety so as to maximize her potential for self-sufficiency constituted a genuine issue of disputed material fact [284-286].

CIVIL ACTION commenced in the Superior Court Department on July 22, 2005.

The case was heard by *Thomas P. Billings*, J., on motions for summary judgment.

*Kenneth V. Kurnos (Alfred A. Gray, Jr.,* with him) for the plaintiff.

[1] By her parents and guardians, Frank A. and Kim A.

[2] Justice Laurence participated in the deliberation on this case and authored this opinion prior to his retirement.

*Juliana deHaan Rice*, Assistant Attorney General (*Julie B. Goldman*, Assistant Attorney General, with her) for the defendant.

LAURENCE, J. This appeal presents us with an affecting legal struggle between devoted parents and conscientious public officials over the most suitable care for a severely disabled and retarded young woman. It arises out of a complaint for declaratory and injunctive relief filed in July, 2005, by Frank A. and Kim A. (collectively, parents) against the Commissioner of the Department of Mental Retardation (DMR), seeking to prevent the DMR from transferring their then twenty-two year old daughter, Molly, from her long-time residential placement at Crotched Mountain Rehabilitation Center (Crotched Mountain) in New Hampshire to another facility in Massachusetts that the DMR deemed appropriate and less costly, a transfer that the parents maintain would offer Molly inadequate care and would violate the DMR's statutory, regulatory, and constitutional obligations to her. A Superior Court judge allowed the DMR's motion for summary judgment and dismissed all three counts of the parents' complaint.[3] We now affirm that judgment as to counts I and III and reverse as to count II.[4]

1. *Background.* From the materials submitted to the judge in conjunction with the parties' summary judgment motions, the material facts relevant to the disposition of this appeal are as follows.[5] Molly, born on March 2, 1983, suffers from Rett's Syndrome (Rett's), a progressively debilitating disorder akin to

---

[3]Count I alleged that the DMR had failed to comply with G. L. c. 123B, §§ 1-3 (transfer statute), which governs the transfer of mentally retarded individuals between residential facilities. Count II averred that the DMR had failed to comply with its obligations under G. L. c. 71B, §§ 12A-12C (turning twenty-two statute), and the Massachusetts Declaration of Rights to provide Molly with habilitative services. Count III asserted that the DMR had violated several statutory and regulatory procedural requirements governing Molly's transition from the public school system to the DMR under the turning twenty-two statute and related regulations, 101 Code Mass. Regs. §§ 10.01-10.06 (1999).

[4]The judge denied the parents' motion for summary judgment on count I of their complaint. Our decision as to count I disposes of the parents' challenge to that ruling. The judge did not, as he was obliged to do, declare the rights of the parties. See part 3, *infra*.

[5]Unless otherwise noted, the facts discussed herein were undisputed. We follow a well-trodden path in reviewing the record on this appellate challenge to the allowance of summary judgment. We view the facts in the light most

69 Mass. App. Ct. 267 (2007)                                    269

Molly A. *v.* Commissioner of the Department of Mental Retardation.

autism that afflicts only females and is often associated (as it is in Molly's case) with enfeebling symptoms, including profound mental retardation (Molly has the cognitive function of a twelve month old child), legal blindness, impaired hearing, inability to speak, constant hand-wringing, and seizures. Molly cannot feed herself or attend to any of her personal or hygienic needs unassisted. Unlike many Rett's patients, she can walk independently, although haltingly.

Since 1994, Molly has resided in a skilled nursing unit at Crotched Mountain in Greenfield, New Hampshire, where she has remained to this day. Crotched Mountain is a private residential facility providing a wide array of rehabilitative services for persons who are mentally retarded, vision and hearing impaired, and otherwise seriously disabled. Molly has received physical, speech, occupational, and music therapies, and (most relevant to the instant case) has had a "one-on-one" aide assigned to her at all times. As a legal resident of Bedford, Massachusetts (where she lived with her mother, Kim A.),[6] Molly has been provided special educational services through the Bedford school district and the Massachusetts Department of Education, which placed her at Crotched Mountain and were responsible for funding her stay and services there through her twenty-second birthday, pursuant to G. L. c. 71B, usually called "Chapter 766" (of the Acts of 1972). Under G. L. c. 71B, §§ 3 and 5, those eligible for special education services receive funding for such services through the public school system of their legal residence until they graduate from high school or turn twenty-two years old. Under G. L. c. 71B, §§ 12A-12C (turning twenty-two

favorable to the parents, as the parties opposing summary judgment; we assume that all of the material facts set forth in their opposing affidavits are true; and we resolve all doubt as to the existence of a genuine issue of material fact — which would make summary judgment improper — against the DMR. See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002); *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370-371, cert. denied, 459 U.S. 970 (1982); *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 17 (1983); *Graham* v. *Quincy Food Serv. Employees Assn. & Hosp., Library & Pub. Employees Union*, 407 Mass. 601, 603 (1990); *Willitts* v. *Roman Catholic Archbishop of Boston*, 411 Mass. 202, 203 (1991); *Northrup* v. *Brigham*, 63 Mass. App. Ct. 362, 366-367 (2005). As to materiality, the substantive law identifies which facts are material. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6]Her father, Frank A., is separated from Kim A. and lives in Boston.

270                   69 Mass. App. Ct. 267 (2007)

Molly A. *v.* Commissioner of the Department of Mental Retardation.

statute), upon turning twenty-two (as Molly did on March 2, 2005), the recipient "ages out" of the public school system and becomes eligible for adult services funded by the DMR.

A year before Molly's twenty-second birthday, a DMR transition coordinator, Barton Price, became involved with Molly and her parents to plan and facilitate the transfer of responsibility for her services from the Bedford school system to the DMR. The parents hoped that the DMR would permit Molly to remain at Crotched Mountain, where she had made unusual progress for a woman her age afflicted with Rett's.[7] Although the DMR briefly considered Crotched Mountain as an appropriate facility to provide adult services to Molly, for a number of reasons it soon began focusing on alternative placements within the Commonwealth.[8] On October 5, 2004, it sent to the parents at Molly's Bedford address (where it mistakenly thought the parents resided together) an "individual transitional plan" (ITP) for Molly, as required by the turning twenty-two statute, G. L. c. 71B, § 12C. The bulk of the ITP, which was drafted by Price, described Molly's ailments (including the fact that she "continues to have periodic seizures") and needs. It concluded with an unelaborated observation that Molly "will be unable to remain at [Crotched Mountain] beyond her 22nd birthday on March 2, 2005"; the clear implication that she would then be transferred to an appropriate residential placement in Massachusetts yet to be determined; and the alarming (to the parents) statement that, if no suitable placement was found for Molly by that time, she would be sent to the Bedford residence with unspecified DMR "support."[9] The ITP included instructions on how to file an administrative appeal should the parents "reject" the plan.

---

[7] In addition to being ambulatory, Molly is able to communicate with her aides through vocalizations (although she cannot speak), facial expressions, and gestures, and to use a modified fork to feed herself with the assistance of an aide. The parents attribute Molly's accomplishments to the high level of care, particularly one-on-one care, she has received at Crotched Mountain.

[8] Among the reasons given (which the parents considered incorrect or disingenuous) were the DMR's inability to certify quality at an out-of-State facility and risks to its receipt of Federal funding for services at such a facility. While initially disclaiming relative cost as a factor, once the controversy was in litigation, the DMR stressed the significantly greater expense of providing services to Molly at Crotched Mountain than at the Massachusetts alternatives it offered the parents.

[9] The turning twenty-two statute, G. L. c. 71B, § 12C, inserted by St. 1983,

Dissatisfied with the ITP, on November 19, 2004, the parents filed a timely appeal to the bureau of transitional planning of the Executive Office of Health and Human Services (EOHHS), pursuant to 101 Code Mass. Regs. § 10.03 (1999).[10] About one month later, they received a letter from the EOHHS acknowledging receipt of the appeal, but never received a response to their appeal in the form of a written ruling affirming or modifying the ITP, as required by the regulation. During this period and into early 2005, the DMR did, however, continue to work with the parents regarding Molly's placement in an appropriate adult facility. On February 23, 2005, after a number of meetings among the DMR representatives, the parents, and the staff at Crotched Mountain,[11] Mary Beth Coyne, the DMR's area direc-

c. 688, § 1, provides, in pertinent part, that an ITP "shall include" at least the following information: "the habilitative services found by the [transitional advisory] committee to be necessary or appropriate to assist such person in realizing his potential for self-sufficiency in major life activities; the agencies responsible for the provision of such services; the location in the least restrictive environment at which such services will be provided; and the expected duration for the provision of such services."

[10]Section 10.03 authorizes an appeal of an ITP within ninety days of its receipt, failure to do so constituting a waiver of the right to an appeal. The parents specifically asked that the plan "be reconsidered" because it did not designate the location proposed for the provision of Molly's services and failed to acknowledge her continuing need for "1:1" care, primarily because of her seizure disorder, including "drop seizures."

[11]The most significant event between the parents' appeal of the ITP and February 23, 2005, was an evaluation of Molly on January 7, 2005, by Heather Shilo, a registered nurse consultant in the DMR's employ, who evaluated Molly at Crotched Mountain. Over a four-hour period, Shilo observed Molly, spoke with several of her caretakers at Crotched Mountain, and met with Kim A. Shilo was unable to secure the parents' permission to receive a copy of all of Molly's medical records, but did review certain portions supplied by Kim A. On the basis of reviewing these records and her visit at Crotched Mountain, Shilo concluded that Molly could successfully integrate into a community residential facility with a two-to-one staffing ratio, with closer, one-on-one supervision for certain activities of daily living, including eating, dressing, and toileting. Shilo opined that Molly did not need twenty-four hour nursing care and a one-on-one aide at all times, based on her "feeling" that the incidence of Molly's seizures — the most significant reason advanced by the parents for one-on-one care because of the risk of serious injury resulting from a fall during a seizure — was not a "serious realit[y]" and that the safety risk such seizures posed had been "overestimated." Shilo was familiar with Rett's and worked with three DMR clients suffering from it who, she claimed, did not need one-on-one care, although she provided no specifics

tor for central Middlesex County, informed the parents that the DMR would not fund Molly's continued stay at Crotched Mountain past her twenty-second birthday.[12]

During February and March, 2005, the parents visited or considered several Massachusetts facilities suggested by the DMR as appropriate residential placements, but found each one unsatisfactory, primarily because they would or could not provide the constant one-on-one care and twenty-four hour nursing services the parents believed were essential to Molly's welfare and safety. March 2, 2005, Molly's twenty-second birthday, came and went without resolution of the issue. On March 24, 2005, the DMR sent a "revised" ITP to the parents that added to the list of Molly's medical problems but left the statement of her needs unchanged. It reiterated that Molly would not be able to stay at Crotched Mountain beyond her twenty-second birthday (although she already had for three weeks, at the DMR's expense) and that she would be sent home with DMR "support . . . until an appropriate residential placement can be developed."

The parents continued to believe that the ITP, even as revised, was incomplete and did not comply with the DMR regulations. On June 3, 2005 (within the ninety-day administrative appeal period), the parents rejected the revised ITP and again appealed, once more stressing the necessity for twenty-four hour per day, one-on-one care because of Molly's seizure disorder and drop attacks, which "have increased in number and length over the past year." On the record provided this court, no response appears ever to have been made to the parents' second ITP appeal, and no further proceedings thereon occurred.

Subsequent to the DMR's issuance of the revised ITP, in late March, 2005, the DMR sent two representatives, Dr. Allen

about those clients that compared with Molly's needs and risks except for one who suffered up to forty-seven seizures per week (but who, unlike Molly, was not at risk for falling because she was nonambulatory and in a wheelchair).

[12]Coyne thereafter extended the deadline for a cutoff of DMR funding to April 14, 2005, and again to June 30, 2005, as the issue of Molly's placement continued to be debated and unresolved. During this period, Molly continued to reside at Crotched Mountain, where her stay was funded by the DMR as of, and after, March 2, 2005; as the result of an injunction eventually obtained from the Superior Court by the parents, Molly has remained there pending the final disposition of this litigation.

C. Crocker and Sharon Oxx, a registered nurse, to Crotched Mountain to review Molly's care plan and determine if her needs could be served in a community setting with less intensive care than the parents were demanding.[13] They observed Molly "in a number of settings" for an undisclosed period of time and met for approximately two hours with senior Crotched Mountain staff who supervised or cared for Molly. Based on his visit, Dr. Crocker concluded that Molly's "seizures . . . are evidently mild, infrequent and not disabling" and the issue of falls "also do[es] not appear to be important," so that Molly could do well in a small group home with a two-to-one patient-staff ratio and intermittent nursing visits. He also noted that in his experience, the overwhelming majority (eighty per cent) of Rett's patients, in fact, live at home with their families.

Oxx opined that Molly was "not as medically fragile" as the parents maintained; that her seizure disorder was infrequent and "appears to be fairly well regulated"; that over the prior twelve months, no reported incidents of injuries associated with seizures had been reported; that Molly did not need twenty-four hour nursing care or constant one-on-one staffing; and that her needs were in fact similar to those of the great majority of people the DMR served (in that she had no self-preservation skills, minimal daily living activities skills, and limited abilities to communicate) who thrived in community residential care programs, as could Molly.

Recognizing the likelihood of impasse and litigation, in the early spring of 2005, the parents retained counsel to represent them in their dealings with the DMR. Through the spring and early summer, counsel communicated to the DMR at greater length the parents' reasons for rejecting the suggested Massachusetts placements and elaborated on the parents' concerns

---

[13]Doctor Crocker is an acknowledged expert in the area of developmental disabilities in children (in which he has worked for fifty years); Rett's; the causes and prevention of developmental disabilities; and medical care for mentally retarded children and adults. Oxx is the DMR's director of health services, specializing in developmental disabilities nursing, and has worked with several Rett's patients. Their conclusions and opinions derived from their visit, as summarized herein, appeared in their affidavits submitted by the DMR in opposition to the parents' subsequent motion for injunctive relief to restrain the DMR from transferring Molly from Crotched Mountain and to require the DMR to continue funding her services there pendente lite.

for Molly's future care, but no agreements could be reached. On July 1, 2005, the DMR sent the parents' counsel a letter recapitulating the several alternative placements the DMR had suggested, mentioning several additional ones, requesting that the parents make a choice by July 8, 2005, so that the transition process could begin, and stating that the DMR would no longer fund Molly's continued stay at Crotched Mountain after July 31, 2005.

Counsel's response to the DMR, dated July 8, 2005, reiterated the parents' objections to the facilities and services proposed by the DMR because none of them provided the level of services Molly's health and safety required, most particularly "constant 1:1 staffing." For the first time, the parents asserted that Molly, having turned twenty-two and been funded by the DMR since her birthday, was now entitled to invoke the provisions of G. L. c. 123B, §§ 1-3 (transfer statute),[14] and lodged a formal request for an administrative transfer hearing and continued funding of Molly's current Crotched Mountain placement. The parents' counsel electronically mailed the DMR a second such request on July 12, 2005.

Receiving no official response from the DMR to either communication, and construing the DMR's silence as reflecting a threat imminently to terminate Molly's funding at Crotched Mountain and transfer her to an inadequate facility or home, the parents' counsel filed the underlying complaint on July 22, 2005, seeking declaratory and injunctive relief[15] on the basis of three arguments. In count I, the parents asserted that the DMR

---

[14]The transfer statute, which governs the DMR's proposals to transfer individuals "receiving residential services through the [DMR]" from one residential facility to another, mandates that the DMR provide that individual's guardians with written notice forty-five days in advance of a transfer. G. L. c. 123B, § 3, inserted by St. 1986, c. 599, § 39. The notice is to specify how the transfer "will result in improved services and quality of life" for the individual; the location of the new facility, with an invitation to visit it; and a statement of the statutory rights of the guardians. *Ibid.* If the guardians object to the transfer, the DMR must commence and prevail at an adjudicatory hearing before the division of administrative law appeals (DALA) at which the DMR bears the burden of proving how the transfer would meet the "best interest" of the mentally retarded person. *Ibid.* Any party aggrieved by the DALA hearing officer's decision has the right to appeal within twenty days to the Superior Court. *Ibid.*

[15]The parents' prayer for injunctive relief was temporarily resolved by a

was required to comply with the transfer statute, G. L. c. 123B, § 3, and prevail at an adjudicatory hearing before effecting a transfer of placement, because the DMR had already begun

stipulation that the DMR would continue Molly's funding at Crotched Mountain until October 31, 2005, an arrangement that, pursuant to the Superior Court judge's temporary injunction issued December 22, 2005, has remained the status quo pending the outcome of this litigation.

At this juncture, we briefly digress to comment on the unusual procedural posture of the underlying litigation. Given the EOHHS's apparent unwillingness to act on the parents' administrative appeal of the revised ITP, the appropriate vehicle for the parents' grievance should presumably have been an action in the nature of mandamus, pursuant to G. L. c. 249, § 5, to require the EOHHS to respond in some fashion to the appeal (which response 101 Code Mass. Regs. § 10.03 appears to make a mandatory duty), see *Trust Ins. Co.* v. *Commissioner of Ins. (No. 1)*, 48 Mass. App. Ct. 617, 621-622 (2000); and to allege that the general prerequisite for obtaining mandamus relief, that available administrative remedies have been exhausted, see *Karl V. Wolsey Co.* v. *Building Inspector of Bedford*, 324 Mass. 419, 422 (1949), could be dispensed with by reason of exceptional circumstances, in this case arguable futility. See *Athol Memorial Hosp.* v. *Commissioner of the Div. of Med. Assistance*, 437 Mass. 417, 426 (2002). Neither occurred here.

One would also have expected the DMR, for its part, to respond to the parents' complaint with certain affirmative defenses, including the parents' unjustified failure to have exhausted their administrative remedies, see *id.* at 426-427; the applicability of the doctrine of primary jurisdiction because of the need for the agency's expertise to resolve the specialized issues involved, see *Leahy* v. *Local 1526, Am. Fedn. of State, County, & Mun. Employees*, 399 Mass. 341, 346-350 (1987); and the general lack of ripeness for judicial review because the agency had several reasonable choices available to it but had yet to make a final determination on the matter. See *Federman* v. *Board of Appeals of Marblehead*, 35 Mass. App. Ct. 727, 729-730 (1994). The DMR's answer, however, contained no such averments. (We hasten to add that the application of these doctrines, which all serve the same purpose of "promoting proper relationships between the courts and administrative agencies," *Nader* v. *Allegheny Airlines, Inc.*, 426 U.S. 290, 303 [1976], are within judicial discretion and are not "jurisdictional" [at least in the instant circumstances] in the sense that neither the Legislature nor decisional precedent has clearly made the agency's final resolution of the issues involved a jurisdictional prerequisite to judicial review [such a jurisdictional challenge being open to review at any stage of the proceedings]. Contrast *Athol Memorial Hosp.* v. *Commissioner of the Div. of Med. Assistance, supra* at 427.)

We have proceeded to address and resolve the questions raised on appeal as presented, because there would be no jurisprudential purpose served by requiring the parties to adhere to what would have been a procedurally more appropriate joinder of issues, that would further delay the determination of this controversy. But we do not intend thereby to suggest our sanctioning of their unorthodox litigation strategy or to assure the future availability of judicial review when established avenues of administrative process are short-circuited without good reason.

276               69 Mass. App. Ct. 267 (2007)

Molly A. *v.* Commissioner of the Department of Mental Retardation.

funding Molly's stay at Crotched Mountain subsequent to her twenty-second birthday. They argued in count II that the DMR had failed to comply with its obligations under the turning twenty-two statute, as set forth in G. L. c. 71B, § 12C, and the Massachusetts Declaration of Rights, which mandate that the DMR provide Molly with proper habilitative services. In support of their position, the parents relied on experts[16] who opined that Molly requires placement in a facility providing constant one-on-one care, chiefly because her seizures and falling risk pose a significant danger for her health and safety. The parents contended in count III that the DMR had also violated the procedural requirements established in the turning twenty-two statute and the DMR's own regulations, 101 Code Mass. Regs.

---

[16]The parents submitted several expert opinions regarding Molly's condition and needs, in the form of affidavit and deposition testimony, in support of their motion for preliminary injunctive relief and in conjunction with the parties' subsequent cross motions for summary judgment. The most significant, for purposes of our review, can be summarized as follows:

Doctor James J. Riviello, Molly's treating neurologist for at least ten years, focused primarily on the risks associated with her continued "intractable" seizure disorder, noting that "[t]he increased number of seizures which Molly is experiencing at the present time" include "drop attacks" which "will cause Molly to potentially fall to the ground and seriously injure herself" and could even cause her death. He noted that because Molly is unable to identify the onset of seizures, she should have one-on-one supervision. He also advised that Molly "reside in a closely supervised environment, such as or similar to her current placement, Crotched Mountain Rehabilitation Center." He further cautioned that "[d]evelopmentally disabled individuals do not tolerate change well."

Doctor Claire D. Wilson, Molly's treating pediatrician for twelve years, similarly recommended that Molly not be transferred from Crotched Mountain, unless to a placement with a similar level of care, stressing that "her conditions have progressively worsened" and that her physical safety is alone sufficient reason for the continued provision of one-on-one supervision because her drop seizures created a risk of "significant harm and [are] potentially life-threatening" without a staff person with her at all times to identify the imminence of a seizure and then to activate a vagal stimulator that Dr. Riviello had implanted to curb the seizure activity.

Doctor John Daignault, an acknowledged expert in mental retardation, performed an independent evaluation of Molly at the behest of her parents and offered a detailed criticism of the DMR's proposed placements. Based upon his review of Molly's medical history and his observations of Molly, he emphasized the "serious risks to Molly's safety" from her "frequent seizures" (which, he opined, were "truly [a matter] of life and death") and advised placing her in a facility with one-on-one care during the day.

§ 10.03, by providing them with an inadequate and noncompliant ITP and by failing to address and resolve their objections to the ITP.

2. *Discussion.* a. *Standard of review.* The parents contend that the Superior Court judge erred in denying their motion for summary judgment on count I and in allowing the DMR's motion for summary judgment on all three counts. Much of the basic standard governing appellate review of summary judgments has been set forth in note 5, *supra.* As applicable to count I, the additional relevant principles are that (1) a summary judgment motion will be granted "if the pleadings, depositions, answers to interrogatories, and responses to requests for admission under Rule 36, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002); and (2) "statutory interpretation is a question of law for the court to decide," *Annese Elec. Servs., Inc.* v. *Newton,* 431 Mass. 763, 764 n.2 (2000), and can be appropriately resolved by summary judgment if there is no real dispute as to the salient facts, *Community Natl. Bank* v. *Dawes,* 369 Mass. 550, 553 (1976).

b. *Count I.* We agree with the judge's observation that "[t]he issue at the heart of Count I is whether the Transfer Statute, G. L. c. 123B, § 3, applies to Molly's situation . . . [,] a question that [the parties agree] does not depend on [disputed] factual circumstances." We further agree with the judge's adoption of the DMR's position that (1) the turning twenty-two statute is the primary process by which individuals receiving special education services under Chapter 766 are moved into the adult services system; (2) the transfer statute, construed, as it must be, in harmony with the turning twenty-two statute, did not yet apply to Molly's situation because an individual service plan (ISP) had not yet been developed for her and such a plan is a precondition of eligibility for the transfer statute's procedural protections[17]; and (3) the DMR was consequently not obligated, as the parents demanded, to prove in an administrative hearing

---

[17]An individual service plan (so denominated in G. L. c. 123B, § 3, but called an "individual support plan" in the DMR regulations thereunder, 115 Code Mass. Regs. § 6.20[1] [2003], both of which are interchangeably referred to herein as an ISP) is to be developed by the DMR for mentally

of the sort required pursuant to the transfer statute that Molly's adult placement would meet her "best interest" — which, were the parents' position correct, would require a placement giving Molly *better* services than those she was receiving at Crotched Mountain.[18] The DMR's view — with which the judge agreed — is that it properly proceeded under the turning twenty-two

retarded individuals under its jurisdiction, setting forth the services, resources, and strategies that will promote the individual's health and safety. 115 Code Mass. Regs. § 6.20(2). An ISP must identify "the setting," i.e., the location, where the services and strategies are to be provided or implemented. 115 Code Mass. Regs. § 6.23(4)(e)(3) (1996).

The DMR's regulations place three particularly significant limitations on the agency's obligations regarding an ISP that are relevant to Molly's circumstances. First, the DMR's provision of services and supports to mentally retarded individuals (with an exception not claimed to be here applicable) are explicitly made "subject to the availability of resources." 115 Code Mass. Regs. § 6.20(1). Second, the DMR has up to twelve months following a mentally retarded individual's twenty-second birthday to develop an ISP if an ITP has already been developed for that individual (as had been done for Molly, notwithstanding the parents' objections to Molly's ITP). 115 Code Mass. Regs. § 6.20(4)(b) (2006). Finally, there is no requirement that the DMR prosecute the adjudicatory administrative proceeding incident to a guardian's objection to a proposed transfer of a mentally retarded individual from one facility to another if such a transfer involves a "change in placement of an individual from a location providing residential services that the Department had begun funding on an interim basis on or before the individual's 22nd birthday," 115 Code Mass. Regs. § 6.63(1)(c)(3) (1996), the very situation of the DMR's involvement with Molly.

These DMR regulations are presumptively valid, *Burke* v. *Commonwealth*, 67 Mass. App. Ct. 88, 91 (2006), and carry the force of law, *Doe* v. *Sex Offender Registry Bd.*, 447 Mass. 768, 775 (2006). Courts are consequently bound to uphold them in the absence of a persuasive demonstration that they are arbitrary and capricious, i.e., that there is no conceivable rational ground on which the regulation can be sustained. See *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 553 (1985). The parents have made no effort to carry their formidable burden of establishing the absence of any conceivable ground on which the relevant DMR regulations can be accorded the judicial deference presumptively due them. They merely assert, in wholly conclusory fashion, that 115 Code Mass. Regs. § 6.63, in particular, is invalid, on the ground that a Superior Court judge so declared in a nonprecedential summary judgment decision, Grady *vs.* Campbell, Bristol Superior Court, No. 9401163 (May 24, 1995). That declaration, however, not only was (as is discussed *infra*) distinguishable, but also itself provided no coherent legal analysis for so holding. The parents' attempt to rely on such truncated reasoning is unavailing. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

[18]Application of the transfer statute to the turning twenty-two statute's process in the manner pressed by the parents — i.e., by compelling the DMR,

statute, with its elaborate procedural structure for developing a transitional plan for an individual coming from special education into adult services,[19] because the transfer statute only applies to individuals who have already completed the transition

before it could place Molly at any facility in Massachusetts to which the parents objected, to initiate an administrative hearing, pursuant to G. L. c. 123B, § 3, at which the DMR would have the burden of proving that a proposed transfer met Molly's "best interest" — would also require the DMR to establish that the proposed placement "will result in *improved services* and quality of life for the retarded" (emphasis supplied) individual, *ibid.*, inserted by St. 1986, c. 599, § 39, presumably meaning services and quality superior to what Molly had been receiving at Crotched Mountain.

[19]The comprehensive language of the turning twenty-two statute, G. L. c. 71B, §§ 12A-12C, and the applicable regulations (101 Code Mass. Regs. §§ 10.01-10.06) can be rationally construed, as the DMR has done here, so as to conclude that the Legislature intended it to govern every disabled individual's transition process from child to adult services. (As a person suffering from disabling mental impairment, Molly falls within the statute. See G. L. c. 71B, § 12A. Cf. G. L. c. 123B, § 1.)

The statute establishes a bureau of transitional planning (BTP) and a transitional advisory committee (TAC). G. L. c. 71B, § 12B. The BTP makes a preliminary determination as to which agency is to develop an ITP. G. L. c. 71B, § 12C. If the TAC approves that determination, the designated agency develops an ITP in cooperation with BTP, the disabled individual, and the disabled individual's parent or guardian, if the disabled individual does not object. *Ibid.* Once an agency develops an ITP, it must be approved by the TAC before it may be put in effect. *Ibid.* All of these steps are intended to occur before the individual turns twenty-two. See *ibid.* The ITP is to specify "the habilitative services [which encompass all services 'directed toward the alleviation of limitations on major life activities of a disabled person, including . . . residential care,' G. L. c. 71B, § 12A, inserted by St. 1983, c. 688, § 1] found . . . to be necessary . . . ; the location in the least restrictive environment at which such services will be provided; and the expected duration for the provision of such services." G. L. c. 71B, § 12C, inserted by St. 1983, c. 688, § 1. The statute's sole form of recourse for guardians who contest the DMR's proposed habilitative services is an administrative appeal of the ITP. See *ibid.*; 101 Code Mass. Regs. § 10.03.

The disabled individual's ITP governs the provision and location of her adult services, G. L. c. 71B, § 12C, until the relevant agency (here, indisputably, the DMR) shall "have developed an individualized service plan [ISP] for the disabled person as specified on the ITP, and the services listed on the ITP are being provided." 101 Code Mass. Regs. § 10.06. The relevant agency has twelve months after an individual receiving residential support has turned twenty-two to develop such an ISP if the individual has an ITP which "calls for the individual's transition to another residential situation." 115 Code Mass. Regs. § 6.20(4)(b).

The DMR's position, that the Legislature did not intend the transfer statute to override or be grafted onto the elaborate administrative process it created

to adult services and have been receiving services from the DMR under an ISP; and because (as explained in notes 18 and 19, *supra*), the DMR has up to twelve months following an individual's twenty-second birthday to develop an ISP if an ITP has been developed for that individual.

Courts have long and consistently accorded "substantial deference to a reasonable interpretation of a statute by the administrative agency charged with its administration [and] enforcement." *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 481 (2006). See *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 491-492 (1978) (upholding administrative interpretation of provisions of G. L. c. 71B). That deference requires, first, that we "apply all rational presumptions in favor of the validity of the administrative [construction of a regulatory statute] and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate," *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). Even more decisively, it enjoins that, "[g]iven . . . two equally plausible readings of the statutory language, we [must] defer to the [agency's] reasonable interpretation . . . . [O]ur role . . . is constrained . . . by the [reasonable] choice of the agency." *Falmouth* v. *Civil Serv. Commn.*, 447 Mass. 814, 821-822 (2006).

Accordingly, we must reject the parents' proffered statutory interpretation, which is based on a literal reading in isolation of the provision of the transfer statute that requires an adjudicatory proceeding if the "guardian . . . for a mentally retarded person

for all disabled individuals in the turning twenty-two statute, is supported by the provision of the transfer statute requiring the DMR to initiate an adjudicatory administrative process "[i]f the individual service plan developed for the mentally retarded person by the department pursuant to its regulations cannot be fully implemented as a result of the guardian's objection to a proposed transfer [from one residential facility to another] . . . ." G. L. c. 123B, § 3, inserted by St. 1986, c. 599, § 39. That language demonstrates — or at least the DMR (and the judge) could rationally so construe it — that the Legislature presupposed that an ISP would be in place before an individual becomes eligible for the transfer statute's procedural protections. The transfer statute thus applies only to those individuals who have already completed the transition to the DMR and from an ITP to an ISP, are receiving adult services through the DMR under an ISP, and are being subsequently transferred.

who is receiving residential services through [the DMR]" objects to a proposed residential transfer of such person for whom an ISP has been developed. G. L. c. 123B, § 3, inserted by St. 1986, c. 599, § 39. The parents' out-of-context reading contravenes the DMR's reasonable position that the turning twenty-two statute initially governs the transition of all disabled persons, including those suffering mental retardation, into adult services via an ITP; and that the transfer statute itself presupposes that a post-ITP ISP will be in place before a mentally retarded individual becomes eligible for the transfer statute's protections (see note 19, *supra*).[20] Moreover, the parents fail coherently to counter the DMR's plausible view of how the two statutes, which are clearly in pari materia, can be read "together [as courts must] to make 'an harmonious whole consistent with the legislative purpose.' " *Healey* v. *Commissioner of Pub. Welfare*, 414 Mass. 18, 25 (1992), quoting from *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, 382 Mass. 580, 585 (1981).

Further, the parents' statutory analysis violates several other principles of statutory construction. We do not interpret regulatory statutes in a manner that imposes procedural requirements on an agency that are not clearly mandated by the statutory language. See *Grocery Mfrs. of Am., Inc.* v. *Department of Pub.*

[20]As authority for their argument, the parents rely on two decisions, Grady *vs.* Campbell, Bristol Superior Court, No. 9401163 (Aug. 31, 1994) (*Grady I*), and Grady *vs.* Campbell, Bristol Superior Court, No. 9401163 (May 24, 1995) (*Grady II*), a Superior Court case with what they deem strikingly similar circumstances. In that case, three individuals aged out of special education upon turning twenty-two, and their guardians, objecting to the DMR's suggested transfers of the individuals, sought an order from the court that the DMR hold an adjudicatory hearing under the transfer statute before transferring them. After one judge granted the guardians a preliminary injunction (*Grady I*), another judge allowed the guardians' summary judgment motion on the ground that the transfer statute did apply (*Grady II*). The case is, however, distinguishable from Molly's (in addition to being not binding on this court). As noted in *Grady II*, the DMR had at least two years during which it could have developed an ISP for the individuals but did not do so, and the individuals had been receiving "temporary" funding from the DMR for well over a year following their twenty-second birthdays. More importantly, the court in *Grady II* did not address the issue of harmonizing the transfer statute with the turning twenty-two statute. We do not find the case analysis in *Grady I* or *Grady II* either relevant or persuasive in resolving the instant matter.

*Health*, 379 Mass. 70, 79-80 (1979). Nor do we construe "statutes embodying procedural requirements" in such a way as to "creat[e] snares for the unwary." *EMC Corp.* v. *Commissioner of Rev.*, 433 Mass. 568, 574 (2001), quoting from *Becton, Dickinson & Co.* v. *State Tax Commn.*, 374 Mass. 230, 233 (1978). Additionally, the parents' arguments neither address nor reflect the deference due the DMR's expertise in interpreting and administering the statutes at issue, to which expertise courts afford "substantial deference." *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 633 (2005).[21]

More decisively, however, courts "will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable." *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996), quoting from *Attorney Gen.* v. *School Comm. of Essex*, 387 Mass. 326, 336 (1982). We are bound to avoid an absurd or unreasonable result when statutory language is susceptible of a sensible, workable construction. *Green* v. *Board of Appeal of Norwood*, 358 Mass. 253, 258 (1970). The parents' position, that the DMR is obliged to comply with the transfer statute once it voluntarily pays anything for an

---

[21]Although judicial deference to administrative "experience, technical competence, and specialized knowledge" is explicitly enjoined only by G. L. c. 30A, § 14(7), as appearing in St. 1973, c. 1114, § 3, which is not here involved, "[t]he fundamental premise of the administrative agency, and indeed the principal reason for the enormous growth of administrative agency power in the twentieth century, has been the conviction that the administrative agency, by virtue of its acquisition or [*sic*] expertise, is better able to make intelligent, effective, and continuing decisions in the public interest in its areas of delegated responsibility than either the legislature or the judiciary. . . . Increasingly courts expressed a willingness to defer to administrative expertise, to permit administrative agencies to make their unique contribution to the administrative process, and generally, not to interfere with the technical, specialized decisions reached by administrative agency experts." Cella, Administrative Law and Practice § 1639 (1986). See *Matter of McKnight*, 406 Mass. 787, 807 (1990) ("The tradition of judicial deference to agency decision making represents an important social policy decision that public agencies are generally in a better position than courts to make particular technical decisions").

Reliance on agency expertise is built into the turning twenty-two statute by the regulations promulgated thereunder, which provide as the sole form of recourse for guardians who contest the DMR's proposed habilitative services (including transfers under an ITP) an administrative appeal to the Secretary of the EOHHS (or his designee), whose decision thereon "shall be final." 101 Code Mass. Regs. § 10.03.

individual's services after her twenty-second birthday, would, if accepted, have three such undesirable consequences. First, it would yield the discordant result that the transition of mentally retarded special education recipients to the DMR would be effected through a different procedure than that applicable to all other special education students moving from child to adult services — a result inconsistent with the generality of the turning twenty-two statute as applicable to all disabled persons receiving special education under Chapter 766.

Second, it would have (as previously explained, see note 18, *supra*) the effect of requiring the DMR to prove that moving disabled mentally retarded individuals from their childhood special education facilities to adult placements would produce not merely continued services at the same level, but "improved" services. Such a financial consequence would conflict with the express limitation in G. L. c. 71B, § 12C, inserted by St. 1983, c. 688, § 1, that services provided to former Chapter 766 recipients are "subject to appropriation," as well as with the conditioning of such services under an ISP to "the availability of resources," 115 Code Mass. Regs. § 6.20(1) (2003).[22]

Finally, and perhaps most contrary to public policy, accepting the parents' argument would undermine the cooperative approach to service delivery embodied in the statutes and the DMR regulations; would effectively penalize the DMR for its good faith decision not to uproot Molly precipitously, but rather continue to voluntarily fund Molly's stay at Crotched Mountain beyond her twenty-second birthday while the parties attempted to negotiate their differences; and would most likely create a disincentive for the DMR to engage in future dispute resolution

---

[22]The parents' theory would effectively tie the DMR to service choices made for mentally retarded special education recipients by local school districts operating under quite different and more liberal financial standards than the DMR, namely, to provide special education children with a specified level of programs and services regardless of cost. See G. L. c. 71B, § 2, inserted by St. 1991, c. 138, § 138 (the school "shall ensure that all efforts have been made to meet such child's needs"). See also 20 U.S.C. § 1400(d)(1)(A) (2000 & Supp. IV 2004) (one purpose of Federal Individuals with Disabilities Education Act is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living").

negotiations with and temporary funding arrangements for any similarly situated guardians and their wards.

In sum, the judge correctly granted summary judgment for the DMR on count I of the parents' complaint.

c. *Count II.* The judge was not, however, as sure footed in his handling of count II, which alleged that the DMR did not comply with its obligations under the turning twenty-two statute and the Massachusetts Declaration of Rights in that its proposed plan (the revised ITP) failed to provide Molly with the proper rehabilitative services to meet her needs — most importantly (to the parents) Molly's need for constant, twenty-four hour, one-on-one care to insure her physical safety because of her seizures and risk of falling. On this count, the judge concluded that the issue of the appropriate level and manner of services for Molly came down to a battle of experts,[23] which could be resolved in the DMR's favor by reason of its experts having opined that its decision to offer placements that would provide Molly with less intensive care than one-on-one was nonetheless a reasonable choice, because it was supported by evidence that the choice comported with accepted professional practice and standards.

The judge relied on a theoretically unimpeachable standard of appellate review — that when an agency has, in the discretionary exercise of its expertise, made a choice between two fairly conflicting but debatable views, and its choice reflects reasonable evidence (especially when supported by qualified experts), a court may not displace that choice or substitute its judgment for that of the agency. See *Conservation Commn. of Falmouth v. Pacheco*, 49 Mass. App. Ct. 737, 740 n.3 (2000), and cases cited. The judge's reliance on that standard was, however, misplaced, because it applies to fully litigated proceedings where there have been sufficient agency findings, or equivalent factual bases, on which to exercise its statutory authority. In the summary judgment context, such reliance resulted in the disregard of the most axiomatic applicable principle: that summary judgment cannot be granted if the evidence properly before the motion judge[24] reveals a genuine issue of disputed material fact.

---

[23]Compare the affidavits of the parties' experts, at notes 11, 13, and 16, *supra.*

[24]None of the expert affidavits was subjected by the judge to the gatekeeper

Viewing the facts in the light most favorable to the parents, we see as hotly disputed the most substantial issue separating the parties with respect to the DMR's undisputed service obligation to Molly: namely, whether the placements proposed by the DMR would provide the habilitative services necessary to insure her physical well-being and safety so as to maximize her potential for self-sufficiency. See G. L. c. 71B, §§ 12A, 12C. We disagree with the judge's observation that the rival experts' opinions on that score differed only "in matters of degree" and merely reflected different "applications of professional judgment" and "differing assumptions." There could not have been more pointed conflict between the parties' experts with respect to the critical factual question underlying that basic issue — whether Molly required twenty-four hour, one-on-one supervision.

Doctor Crocker and nurses Shilo and Oxx opined for the DMR that Molly's seizures were mild, infrequent, not disabling, and fairly well-regulated, and that the risk of her injury from falling during a seizure did not appear to be important, had

analysis required under *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25-26 (1994), which applies to all expert testimony, not just that expressing views on scientific matters, *Canavan's Case*, 432 Mass. 304, 313 (2000). We cannot, however, conclude that the judge committed an abuse of discretion, *id.* at 312, by failing to have exercised his discretion in this respect, see *Commonwealth* v. *Manning*, 47 Mass. App. Ct. 923, 923 (1999), and cases cited, because neither party made a *Lanigan* challenge to the other's expert evidence. See *Cortes-Irizarry* v. *Corporacion Insular de Seguros*, 111 F.3d 184, 188-189 (1st Cir. 1997). Had one been made by the parents, it might have succeeded, not so much by reason of the DMR's experts' lack of qualifications, but rather because their evidence largely failed to satisfy the requirements of Mass.R. Civ.P. 56(e), 365 Mass. 825 (1974), consisting mostly of conclusory opinions not based on admissible facts of personal knowledge (e.g., they based most of their opinions on extremely brief observations and on hearsay records and statements of third persons at Crotched Mountain, whereas the parents' principal experts testified to specific facts based on their first-hand knowledge gleaned from many years of personally treating and observing Molly). The very phenomenon that rival experts present conflicting views on summary judgment motions strongly implies that disputed issues of fact exist. See, e.g., *Wyler Summit Partnership* v. *Turner Bdcst. Sys., Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000) ("Weighing the credibility of conflicting expert testimony is the province of the jury"); *Larsen* v. *Simonds Indus, Inc.*, 337 F. Supp. 2d 331, 336 n.2 (D. Mass. 2004) ("The competing [expert] statistical analyses . . . create[d] a classic 'battle of the experts' that is properly resolved by a jury"). See generally Brunet, The Use and Misuse of Expert Testimony in Summary Judgment, 22 U.C. Davis L. Rev. 93 (1988).

been overestimated, and was not a serious reality. Consequently, they saw no need for constant one-on-one care for her. The parents' experts, Drs. Riviello, Wilson, and Daignault, on the other hand, described Molly's seizure disorder as "intractable," with her seizures increasing in number, progressively worsening, and creating a serious risk of injury from falls. Providing Molly with round-the-clock, one-on-one supervision was, they concluded, potentially a matter of life and death.

These opinions, which go to the very heart of the decision as to Molly's most appropriate placement, are not mere differences in degree, but rather represent polar views regarding the outcome-determinative, unresolved issue dividing the parties. That issue manifestly requires trial. The judge (and certainly this court) may not usurp the function of the factfinder by passing on the relative credibility of the rival experts, evaluating the comparative weight of their evidence, assessing whether the DMR's view of Molly's condition is more valid or plausible than that of the parents, or concluding that the parents are unlikely to prevail on this issue at trial. See *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370 (1982). On this record, the allowance of summary judgment for the DMR on count II was error.

d. *Count III.* The parents alleged in count III of their complaint that the DMR's revised ITP failed to comply with statutory requirements (particularly as to specifying the location and expected duration of services, G. L. c. 71B, § 12C); and that the DMR failed to comply with its own regulations by not modifying or affirming that ITP within thirty days following their appeal. 101 Code Mass. Regs. § 10.03. The effect of these procedural defects, they contend (based on their proposed reading of 115 Code Mass. Regs. §§ 6.20[4][b], 6.23[3], 6.23[5][a]), is that there was no valid ITP in existence on and after March 2, 2005, while Molly was receiving the DMR funding. The net result is that the transfer statute should have been applied to Molly's situation, entitling her to an ISP within ninety days of her twenty-second birthday. Consequently, they argue, summary judgment on this count was inappropriate.

The parents devote less than two pages of their brief to this rather convoluted issue and rely on bare assertions regarding the meaning of the cited statutes and regulations, unaided by

precedential, or even analogous, supportive legal authority and contrary to Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).[25] Moreover, the revised ITP they attack — indeed, even the initial ITP — appears on its face to comply, if minimally, with the statute.[26] Further, nowhere do they suggest how a timely DMR-developed ISP would have differed in any meaningful way from the DMR's revised ITP — particularly in light of the express regulatory limitation on ISP-proposed services as being "subject to the availability of resources." 115 Code Mass. Regs. § 6.20(1).[27]

The greatest difficulty with count III, however, is that, in substance, it presents the same pure question of law — did the DMR act as the law requires in proceeding in Molly's case under the turning twenty-two statute rather than under the transfer statute — that the judge correctly resolved in the DMR's favor in granting summary judgment on count I.[28]

---

[25]The parents make a number of entirely conclusory legal assertions, including the contentions that the revised ITP was defective and a nullity (see note 26, *infra*); that the DMR's failure to act within thirty days of the parents' appeal vitiated the revised ITP entirely; that the DMR must be deemed to be the EOHHS Secretary's designee for purposes of ruling on ITP appeals under 101 Code Mass. Regs. § 10.03; and that there being no ITP in place when Molly turned twenty-two, she was entitled to an ISP as of that date and to the procedural protections against transfer afforded by G. L. c. 123B, § 3.

[26]See G. L. c. 71B, § 12C. The requisite location is listed as Molly's family home in Bedford; the expected duration is stated to be "until an appropriate residential placement can be developed"; the rehabilitative services deemed appropriate by the DMR's transitional advisory committee are set forth at length; and the DMR is incontestably the agency responsible for the provision of such services.

[27]As the judge accurately observed, "The cost of services is a legitimate concern for the [DMR]. . . . Unlike the Chapter 766 'unfunded mandate' model under which the cost of Molly's Crotched Mountain placement was funded until age 22, DMR programming is subject to appropriation [by G. L. c. 71B, § 12C]; the [DMR] must . . . serve the Commonwealth's [entire] developmentally disabled adult population with such resources as the Legislature provides."

[28]In count III, the parents continued to protest the failure of the DMR (which they assume is the designee of the EOHHS Secretary for appeal purposes) formally to respond to their June, 2005, appeal of the revised ITP, by "either affirming or modifying the ITP" within thirty days of their appeal, as provided in 101 Code Mass. Regs. § 10.03. They have not, however, demanded any specific relief with respect to that procedural failure. This is presumably because of their legally unsupported theory that the revised ITP

3. *Disposition.* The parents' complaint specifically requested declaratory relief as to the applicability of the transfer statute to any DMR transfer of Molly from Crotched Mountain and as to Molly's right to receive sufficient funding and services from the DMR for her continued safety and habilitation. The judge, however — perhaps in consequence of his "presumptions" that the Commonwealth "will honor its obligations" and that the DMR "will continue to work with Molly's parents toward a placement that is optimally suited to Molly's needs within the available program options and funding, and that satisfies accepted professional standards for meeting her developmental, medical, and personal safety needs" — simply dismissed the parents' complaint after allowing the DMR's motion for summary judgment. When a complaint requests declaratory relief, the judge must declare the rights of the parties, even when

was defective and the DMR's failure to "correct" its perceived deficiencies within thirty days extinguished that ITP, so that no ITP was in place when Molly turned twenty-two, and Molly was consequently entitled to the procedural protections accorded those who have an ISP.

We agree with the DMR that any delay in responding to the parents' administrative appeal did not invalidate, per se, the ITP. See, e.g., *Cullen* v. *Building Inspector of N. Attleborough,* 353 Mass. 671, 679-680 (1968). Contrast, e.g., *Hashimi* v. *Kalil,* 388 Mass. 607, 609-610 (1983). We also agree with the DMR that such a regulatory violation should be deemed harmless error in any event, because the DMR's continued negotiations with the parents over Molly's placement clearly manifested to them the DMR's position as to the legality and propriety of proceeding in Molly's case under the revised ITP, which effectively constituted an affirmance of the ITP and represented a final decision (under the parents' view that the DMR was the EOHHS designee) that thereby terminated all administrative appeal proceedings under the regulation. That turn of events appeared to leave the parents with only resort to judicial relief to challenge the DMR placement proposals. That is precisely what they did in commencing the underlying litigation shortly after the expiration of the thirty-day decision-making period under the ITP appeal regulation; and it essentially represented the very action they would have had to take in an effort to obtain further relief had the DMR (or the EOHHS Secretary) timely responded to their administrative appeal of the revised ITP with an affirmance. (But see note 15, *supra.*)

Nevertheless, we agree with the parents that they were entitled — if only as a matter of efficient, public service oriented administrative process in this uncertain and emotionally charged situation — to a timely and more explicit explanation from the DMR in justification of its revised ITP. Such a procedurally proper handling of the parents' objections conceivably could have yielded more cooperative interchanges and obviated judicial proceedings, or at least minimized the contested issues between the parties.

relief is denied, *Animal Legal Defense Fund, Inc.* v. *Fisheries & Wildlife Bd.*, 416 Mass. 635, 641 (1993), and even on motions for summary judgment, *146 Dundas Corp.* v. *Chemical Bank*, 400 Mass. 588, 589 n.4 (1987).

Accordingly, the judgment is modified so as to declare that the provisions of the turning twenty-two statute, G. L. c. 71B, §§ 12A-12C, and not the transfer statute, G. L. c. 123B, §§ 1-3, apply to Molly's transfer by the DMR from Crotched Mountain to another placement for the provision of such services and supports as are in compliance with applicable statutory and regulatory criteria and requirements. In addition, for those reasons discussed *supra*, the judgment is affirmed in so far as it grants the DMR's motion for summary judgment as to counts I and III of the complaint. The judgment is reversed in so far as it grants the DMR's motion for summary judgment on count II, and the case is remanded for such further proceedings with respect to count II as are consistent with this opinion.

*So ordered.*