# J.W.[1] *vs.* DEPARTMENT OF DEVELOPMENTAL SERVICES & another.[2]

No. 12-P-1760.

Middlesex. June 6, 2013. - October 3, 2013.

Present: VUONO, BROWN, & SIKORA, JJ.

*Division of Administrative Law Appeals. Department of Developmental Services. Intellectually Disabled Person. Administrative Law,* Judicial review. *Statute,* Construction.

This court concluded that the transfer statute, G. L. c. 123B, § 3, governing the process that must be followed by the Department of Developmental Services (department) in every case where it seeks to transfer an intellectually disabled individual from one residential facility for the intellectually disabled to another, requires an administrative magistrate of the Division of Administrative Law Appeals to determine which of the two residential placements, i.e., the current one or the proposed one, meets the best interest of the intellectually disabled individual; accordingly, reversal was required of a Superior Court judge's decision vacating the approval by an administrative magistrate of such an involuntary transfer, where the judge's decision was based on a flawed interpretation of the transfer statute, i.e., that, faced with two flawed transfer choices, the administrative magistrate should have allowed full litigation of additional alternative possibilities or ordered the department to consider such possibilities. [343-345]

CIVIL ACTION commenced in the Superior Court Department on September 15, 2011.

The case was heard by *Douglas H. Wilkins,* J., on a motion for judgment on the pleadings.

*Timothy J. Casey,* Assistant Attorney General, for the defendants.

*Stephen M. Sheehy* for the plaintiff.

BROWN, J. In a thoughtful and comprehensive seventy-six

[1]By his coguardians, Diane W. McDonald and Teresa W.

[2]Division of Administrative Law Appeals.

page decision, an administrative magistrate of the Division of Administrative Law Appeals (DALA) approved the involuntary transfer of J.W., a severely intellectually disabled individual, from his residence at Malone Park 23 at the Fernald Developmental Center (FDC) to Heffron Hall A, apartment 4, at the Wrentham Developmental Center (WDC). See G. L. c. 123B, § 3, as amended through St. 2010, c. 239, §§ 46-48.

On review, a judge of the Superior Court concluded that while "there [was] no lack of substantial evidence for the decision," the magistrate erred by limiting his consideration of J.W.'s best interest to placements at either Malone Park 23 or the single alternative proposed by the Department of Developmental Services (DDS). See G. L. c. 30A, § 14(7)(*c*). On this basis, judgment entered vacating DALA's decision and remanding the matter to DALA for further proceedings. This appeal followed. Although we agree with the judge's conclusion that substantial evidence supported DALA's decision, we disagree with his statutory construction. Accordingly, we vacate the judgment of the Superior Court and remand the case for entry of a judgment affirming DALA's decision.

Because this appeal turns on an issue of statutory interpretation, we set out the terms of the governing transfer statute, G. L. c. 123B, § 3 (transfer statute or § 3), in some detail. The transfer statute provides a specific process that must be followed by DDS in every case where it seeks to transfer an intellectually disabled individual "from one residential facility for the intellectually disabled to another." G. L. c. 123B, § 3, first par. The first paragraph of § 3 establishes that DDS must consult with the permanent guardians (or nearest relative) of the individual and give notice "at least forty-five days prior to the proposed transfer." *Ibid.*

The second paragraph of § 3 governs notice and requires DDS to request the consent of the guardian "prior to the transfer . . . from one residential facility for persons with an intellectual disability to another." G. L. c. 123B, § 3, second par. The consent must be requested in writing by registered mail "at least forty-five days prior to the proposed transfer." *Ibid.* DDS

must include certain specific information in the written notice and request for consent to the proposed transfer.[3]

The third paragraph of § 3 governs the adjudicative process in cases (such as this one) where the guardian timely objects to the proposed transfer. The paragraph authorizes DALA to conduct a hearing at the request of DDS in order to determine "whether the transfer should proceed." G. L. c. 123B, § 3, third par. The transfer statute places the burden of proof upon DDS and prohibits DDS from effecting the proposed residential transfer during the pendency of the hearing. Within thirty days of the hearing, the hearing officer is required, in accordance with § 3, to issue a written decision determining "*which placement* meets the best interest of the ward giving due consideration to the objections to the placement made by the relative or permanent guardian" (emphasis added). *Ibid.* The parties then have twenty days within which to appeal the decision to the Superior Court.

In this case, the judge read the phrase "which placement meets the best interest of the ward" to necessarily refer to multiple alternatives, "especially if it takes an alternative placement to 'meet the best interest of the ward.' " On that basis, the judge ruled that, faced with two flawed choices, DALA should have allowed "full litigation" of additional alternative possibilities or ordered DDS to consider them.[4] For many reasons, we disagree with this interpretation.

---

[3]Pursuant to the transfer statute and DDS's implementing regulation, the notice of the proposed transfer must include a statement of how the proposed residential transfer from the current facility to the proposed facility will result in improved services, supports, and quality of life for the intellectually disabled individual; specify the location of the proposed residence; include a statement that the guardian may visit and examine the proposed placement at a time and in a manner not disruptive to the individuals living at the residence; invite the guardian to consult with the service coordinator or other designated staff regarding the advantages and disadvantages of the proposed transfer; and include a statement of the legal rights of the parties under § 3 and the DDS regulation. See G. L. c. 12B, § 3; 115 Code Mass. Regs. § 6.63(2)(c) (2009).

[4]The judge suggested several procedures that could be implemented by DALA to meet its purported statutory duty: (1) requiring DDS to submit first and second tier alternatives; (2) implementing a phased hearing to allow the parties to address the question of alternatives after the magistrate's review of DDS's original rationale; and (3) conditionally rejecting the proposed WDC transfer pending exploration of alternatives. None of these procedures is even remotely hinted at in the language of the transfer statute. See *Serrazina* v. *Springfield Pub. Schs.*, 80 Mass. App. Ct. 617, 623 (2011), *S.C.*, 464 Mass.

We begin, as always, with the text of the statute. See *Halebian* v. *Berv*, 457 Mass. 620, 628 (2010). While the adjective "which" could refer to any number of a group of alternative placements, the adoption of that meaning here improperly ignores the plain and unambiguous antecedent language.[5] See *Milford* v. *Boyd*, 434 Mass. 754, 759-760 (2001); *Wheatley* v. *Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 601 (2010). In particular, this interpretation is inconsistent with the process set forth in the second paragraph of § 3 requiring (1) DDS to propose and to give notice of one alternative placement and (2) guardians opposed to that proposed transfer to object to that proposed placement in writing. The interpretation mandating multiple alternatives is also undercut by the jurisdictional grant limiting DALA to determining "whether *the transfer* should proceed" (emphasis added). Given the Legislature's consistent use of the singular throughout the statute, "transfer" can only be understood to refer to the one residential placement proposed by DDS.

This interpretation also conflicts with the statutory standard as construed by DALA and this court calling for a comparison of the proposed placement with the existing placement.[6] See *Molly A.* v. *Commissioner of the Dept. of Mental Retardation*, 69 Mass. App. Ct. 267, 277-279 & n.18 (2007); *M.D.* v. *Department of Developmental Servs.*, 83 Mass. App. Ct. 463, 476-477 (2013).

Not only is the interpretation mandating the consideration of multiple alternatives inconsistent with the statutory scheme, it

1011 (2013), quoting from *Carmel Credit Union* v. *Bondeson*, 55 Mass. App. Ct. 557, 560 (2002) ("we interpret a statute according to its plain words and will 'not add words to a statute that the Legislature did not put there' ").

[5]When used as an interrogative adjective, the word "which" is defined as "being what one or ones out of a group; . . . whichever." Webster's Third New Intl. Dictionary 2603 (1993). The adjective may also be "used as a function word to introduce a nonrestrictive relative clause and to modify a noun in that clause and to refer together with that noun to a word or word group in a preceding clause or to an entire preceding clause or sentence or longer unit of discourse . . . ." *Ibid.*

[6]DALA has interpreted its statutory mandate as requiring it to decide whether the proposed placement will result in improved services and quality of life for the individual after giving due consideration to the guardians' objections, a test derived by reading the second and third paragraphs of § 3 together.

would inject unnecessary elements of uncertainty and complexity into the process. It is unclear how many alternatives DDS would be required to "consider" and to submit to DALA for litigation. As each placement recommendation involves a significant number of clinicians, administrators, and staff, requiring DDS to propose and to support multiple placement alternatives would potentially place a significant burden upon the agency. DDS clinicians would, moreover, be forced to submit secondary options that may not be in the individual's best interest. Where, as here, another possible statutory interpretation exists, such an inefficient and illogical result cannot be sanctioned. See *Milford* v. *Boyd*, 434 Mass. at 759, quoting from *Tilton* v. *Haverhill*, 311 Mass. 572, 577-578 (1942) ("[S]tatute . . . should be so construed as to make it an effectual piece of legislation in harmony with common sense and sound reason").

Read as a whole, the transfer statute requires DALA to determine which of the two residential placements to which reference is made in the second paragraph (current or proposed) meets the best interest of the intellectually disabled individual. If DALA concludes that DDS failed to prove that the proposed residential placement will meet the individual's best interest by providing improved services and quality of life, DALA must disapprove the transfer, thereupon ending the formal statutory transfer proceeding.[7] In that case, the intellectually disabled individual will continue to reside at the current placement until the guardians consent to a transfer or DDS prevails at a subsequent DALA hearing.

We agree with DDS that the planning stage of the transfer process is the most appropriate time to consider multiple alternative placements. See *M.D.* v. *Department of Developmental Servs.*, *supra* at 476-477. Indeed, the guardians did not "disagree with the notion that alternatives should be considered during the planning process and not at or after the ITP/ISP modification meeting."

Ideally, placement planning is intended to be a cooperative,

---

[7]In the three FDC transfer cases in which DALA concluded that DDS had not met its burden of proof, DALA followed this procedure. At the conclusion of those proceedings, DDS began the process anew of identifying other placement options for these individuals.

collaborative process between the guardians and DDS. The transfer statute anticipates that by the time the parties arrive at an impasse requiring litigation, DDS will have already identified and offered a number of appropriate placement options. In fact, here the record established that during the planning phase of the placement process, DDS offered multiple alternative placements to the guardians, including placements at WDC where openings existed at the time.[8] The guardians rejected all offers and counterproposed a single, unavailable alternative.[9]

We have considered the guardians' other claims and find them foreclosed by *M.D.* v. *Department of Developmental Servs.*, *supra*, unsupported by the evidence or facts of record, nonprejudicial, or otherwise lacking in merit.

The interpretation of the transfer statute here was legally erroneous. We vacate the judgment and remand the case to the Superior Court for the entry of a new judgment affirming the transfer decision.

*So ordered.*

---

[8]Placement options offered by DDS included a proposal to participate in a group transfer to WDC with other long-term housemates from FDC (an option pursued by many guardians); an offer to keep J.W. at his home at Malone Park to be converted into a group home following FDC's closure; other group homes; and placements at WDC and the Hogan Regional Center (the only two Intermediate Care Facilities for the Intellectually Disabled [ICFs] to remain open under DDS's consolidation and closure plan). The guardians categorically rejected as inferior *all* State- and vendor-operated group homes offered as well as *all* alternative placements at WDC and Hogan.

[9]The magistrate addressed the only alternative placement suggested by the guardians, that is, keeping Malone Park open as a small ICF, ruling that because the Legislature had directed DDS to close FDC as an ICF without exception, DDS did not violate the transfer statute by declining to offer Malone Park, as a small ICF, as a possible alternative placement for J.W.