SUPERIOR COURT 
 
 HAVERHILL STEM LLC vs. JAMES J. FIORENTINI[1] & another[2]

 
 Docket:
 2177CV00375
 
 
 Dates:
 June 10, 2024
 
 
 Present:
 Jeffrey T. Karp
 
 
 County:
 ESSEX
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT ON COURT-ENDORSED LEGAL ISSUES (Paper Nos. 32 and 33.1)
 
 

 INTRODUCTION
            Plaintiff Haverhill Stem LLC (“Stem”) has operated a retail recreational marijuana store in the City of Haverhill (“City”) since May 2020, after having obtained a final license to do so from the Cannabis Control Commission (“CCC”) pursuant to G.L. c. 94G, §§ 1, et seq. (“Marijuana Act”).
            As required by the Marijuana Act, the parties entered into a Host Community Agreement (“HCA”) in December 2018, which requires, inter alia, Stem to pay annual community impact fees (“CIFs”) of three percent of its gross sales to the City for five years.
            In 2021, Stem brought this suit against the City after a dispute arose between the parties regarding the assessment and documentation of the first annual CIF under the parties’ HCA.
 
--------------------------------------------
 
[1] In his capacity as mayor of the City of Haverhill.
[2] City of Haverhill.
 
                                                            -1-
 
            After Stem filed this lawsuit in 2021, the Legislature amended the provisions of the Marijuana Act that govern CIFs and HCAs, effective November 9, 2022, and, in response, the CCC[3] amended its regulations at 935 CMR 500, et seq., effective September 23, 2023.
            The parties dispute whether the 2022 statutory and 2023 regulatory amendments apply to their rights and obligations under the 2018 HCA. In response to that dispute, the Court ordered the parties to agree upon issues of law to frame for the Court’s consideration on summary judgment. In response, the parties submitted to the Court a “Joint Statement of Issues Framed for Summary Judgment” (Paper No. 30), which the Court endorsed on October 18, 2023. See marginal endorsement order at Paper No. 30.
            On February 7, 2024, the parties were before the Court for a hearing on the parties’ cross-motions for summary judgment on those issues, i.e., Plaintiff’s Motion For Summary Judgment On Statement Of Framed Issues Pursuant To The Court’s Endorsement Dated October 18, 2023 (Paper No. 32) (“Stem Motion”) and Defendant’s Motion For Summary Judgment On Court-Endorsed Legal Issues (Paper No. 33.1) (“City Motion”).
            As is fully discussed below, the Court interprets certain provisions of the HCA, and rejects Stem’s argument that the amendments to the statutes and regulations should apply to the HCA. Accordingly, the Stem Motion is DENIED and the City Motion is ALLOWED in part.
 
--------------------------------------------
 
[3] The CCC is the state-level entity tasked with overseeing the cultivation, use and distribution of medical and recreational marijuana. See G.L. c. 10, § 76 (establishing CCC); G.L. c. 94G, § 4 (granting regulatory powers to CCC).
                                                            -2-
 
STATUTORY AND REGULATORY FRAMEWORK
The Marijuana Act
            As a result of the approval of Massachusetts voters to legalize the retail sale of marijuana to adults for recreational use in 2016, the Legislature codified the Marijuana Act at G.L. c. 94G.[4]
            “Chapter 94G provides for, among other things, the sale of marijuana to adults for recreational use and empowers the [CCC] to oversee and regulate the use and distribution of recreational marijuana . . . . The Legislature tasked the [CCC] with regulating the Commonwealth’s new marijuana industry by, among other responsibilities, issuing licenses to prospective marijuana establishments.” Mederi, Inc. v . Salem, 488 Mass. 60, 61 - 62 (2021) (citation omitted). Moreover, “[c]hapter 94G also allows municipalities to determine the conditions under which they are willing to ‘host’ retail marijuana establishments,” id. at 62 – 63, including charging a CIF to the marijuana establishment.
            Of particular relevance to this dispute is G.L. c. 94G, § 3(d), which provides that, before applying to the CCC for a license to sell recreational marijuana, the retail marijuana establishment must execute an HCA with the municipality where the retail marijuana establishment plans to operate.
 
--------------------------------------------
 
[4] The Marijuana Act was amended in 2017, effective July 28, 2017.
 
                                                            -3-
 
            The version of G.L. c. 94G, § 3(d), in effect from July 28, 2017, through November 8, 2022, provides as follows with respect to HCAs and CIFs:
A marijuana establishment . . . seeking to operate or continue to operate in a municipality which permits such operation shall execute an agreement with the host community setting forth the conditions to have a marijuana establishment or medical marijuana treatment center located within the host community which shall include, but not be limited to, all stipulations of responsibilities between the host community and the marijuana establishment An agreement between a marijuana establishment and a host community may include a community impact fee for the host community; provided, however, that the community impact fee shall be reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment and shall not amount to more than 3 per cent of the gross sales of the marijuana establishment or be effective for longer than [5] years. Any cost to a city or town imposed by the operation of a marijuana establishment shall be documented and considered a public record as defined by clause Twenty-sixth of section 7 of chapter 4.
G.L. c. 94G, § 3(d) (eff. July 28, 2017 – November 8, 2022) (emphasis added).
The 2022 Act
            After Stem filed suit in this case in April of 2021, the Legislature amended G.L. c. 94G, effective November 9, 2022. See Chapter 180 of the Acts of 2022, “An Act Relative to Equity in the Cannabis Industry” (“2022 Act”).
            The 2022 Act did not change the requirement that CIFs “shall be reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment.” G.L. c. 94G, § 3(d) (eff. July 28, 2017 – November 8, 2022); G.L. c. 94G, § 3(d)(2)(A) (eff. November 9, 2022). However, the 2022 Act made several significant changes to the Marijuana Act regarding the assessment and documentation of CIFs by a municipality.[5]
 
--------------------------------------------
 
[5] The 2022 Act also amended various tax-related statutes that are not at issue in this matter.
 
                                                            -4-
 
            First, the 2022 Act increased the maximum length of time that a CIF may be assessed by a municipality from five years, see G.L. c. 94G, § 3(d) (eff. July 28, 2017 – November 8, 2022), to eight years. See G.L. c. 94G, § 3(d)(2)(C) (eff. November 9, 2022). Second, while the 2022 Act retained the cap on the amount of a CIF of not more than three percent of gross sales, G.L. c. 94G, § 3(d)(2)(B) (eff. November 9, 2022), the 2022 Act prohibits the mandating of “a certain percentage of total or gross sales as the community impact fee.” G.L. c. 94G, § 3(d)(2)(E) (eff. November 9, 2022).
            More specifically, these two changes to § 3(d) of the Marijuana Act are reflected in the 2022 Act as follows:
(1) A marijuana establishment . . . seeking a new license or renewal of a license to operate or continue to operate in a municipality that permits such operation shall negotiate and execute a host community agreement with that host community setting forth the conditions to have a marijuana establishment . . . located within the host community, which shall include, but not be limited to, all stipulations of responsibilities between the host community and the marijuana establishment. . . .
(2)(I) Notwithstanding any general or special law to the contrary, a host community agreement may include a community impact fee for the host community; provided, however, that no host community agreement shall include a community impact fee after the eighth year of operation of a marijuana establishment The community impact fee shall: (A) be reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment or medical marijuana treatment center, as documented pursuant to subparagraph (iii); (B) amount to not more than 3 per cent of the gross sales of the marijuana establishment ; (C) not be effective after the marijuana establishment[‘s] eighth year of operation; (D) commence on the date the marijuana establishment is granted a final license by the commission; and (E) not mandate a certain percentage of total or gross sales as the community impact fee.
(ii) Notwithstanding any general or special law to the contrary, the community impact fee shall encompass all payments and obligations
 
                                                            -5-
 
between the host community and the marijuana establishment. . . . The community impact fee shall not include any additional payments or obligations, including, but not limited to, monetary payments, in- kind contributions and charitable contributions by the marijuana establishment . . . to the host community or any other organization. Payment of the community impact fee shall be due annually to the host community, with the first payment occurring not sooner than upon the first annual renewal by the commission of a final license to operate the marijuana establishment . . . Any other contractual financial obligation that is explicitly or implicitly a factor considered in, or is a condition of a host community agreement, shall not be enforceable. Nothing in this section shall preclude a marijuana establishment . . . from voluntarily providing organizations with monetary payments, in-kind contributions and charitable contributions after the execution of the host community agreement; provided, however, that a host community agreement shall not include a promise to make a future monetary payment, in-kind contribution or charitable contribution.
G.L. c. 94G, § 3(d)(1) - (2) (eff. November 9, 2022) (emphasis added).
            Third, the 2022 Act expressly requires the CCC to review and approve each HCA as part of a marijuana establishment license application (and at each license renewal), and it prohibits the CCC from approving “a final license application” unless it certifies that the HCA complies with section 3(d).[6] S ee G.L. c. 94G, § 3(d)(3) (eff. November 9, 2022).
            More specifically, this third change to § 3(d) of the Marijuana Act is reflected in the 2022 Act as follows:
(3) The commission shall review and approve each host community agreement as part of a completed marijuana establishment . . . license application and at each license renewal. If the commission determines that a host community agreement is not in compliance with this section, the commission shall provide written notice of any deficiencies and may request additional information from the prospective licensee and host
 
--------------------------------------------
 
[6] Prior to the 2022 Act, “it [wa]s the [CCC]’s position that, under the [the prior] statutory scheme, its role [wa]s limited to reviewing license applications after an HCA ha[d] been executed.” Mederi, Inc., 488 Mass. at 72 n.19.
 
                                                            -6-
 
community. The commission shall not approve a final license application unless the commission approves the host community agreement and certifies that the host community agreement complies with this subsection. The commission shall complete its review of a host community agreement not later than 90 days after it is received by the commission.
G.L. c. 94G, § 3(d) (eff. November 9, 2022) (emphasis added).
            Fourth, while the prior law required the municipality to document any cost imposed on it by the operation of the marijuana establishment, see G.L. c. 94G, § 3(d) (eff. July 28, 2017 – November 8, 2022), the 2022 Act created a completely new procedure that municipalities must follow to document (and disclose) CIFs, and grants the licensee the right to bring an action for breach of contract if it believes that the documentation is deficient.
            More specifically, that fourth pertinent change to § 3(d) of the Marijuana Act is reflected in the 2022 Act as follows:
(iii) Any cost imposed upon a host community by the operation of a marijuana establishment . . . shall be documented by the host community and transmitted to the licensee not later than 1 month after the date of the annual renewal of a final license to operate the marijuana establishment . . . and shall be a public record as defined by clause Twenty-sixth of section 7 of chapter 4 and chapter 66. If a licensee believes the information documented and transmitted by a host community is not reasonably related to the actual costs imposed upon the host community in the preceding year by the operation of the marijuana establishment . . . , the licensee may bring a breach of contract action against the host community and recover damages, attorneys' fees and other costs encompassed in the community impact fee that are not reasonably related to the actual costs imposed upon the city or town.
G.L. c. 94G, § 3(d)(2)(iii) (eff. November 9, 2022) (emphasis added).
 
                                                            -7-
 
FACTUAL BACKGROUND[7]
            Stem operates as a licensed marijuana establishment at 124 Washington Street in Haverhill.
            On May 1, 2018, Stem obtained an Economic Empowerment License[8] and submitted an application for a retail marijuana establishment license to the CCC on March 31, 2019.
            On or about November 26, 2019, Stem received its provisional license from the CCC.
            On May 26, 2020, Stem received its final license from the CCC to commence operations, and began operations on May 30, 2020.
The Parties’ HCA
            Prior to receiving its CCC license, Stem entered into an HCA with the City dated December 28, 2018, which is included in the record at Exhibit 30.
            In Article II, Section A, of the HCA, titled “Community Impact Fee,” Stem agreed to pay an annual CIF to the City as follows:
The Company anticipates that the City will incur additional expenses and impacts on the City’s road and other infrastructure systems, law enforcement, fire protection services, inspectional services, and permitting and consulting services, as well as unforeseen impacts on the City. Accordingly, in order to mitigate the financial impact on the City and use of City resources, the Company agrees to pay an Annual Community Impact Fee to the City, in the amount and
 
--------------------------------------------
 
[7] The relevant facts are not in dispute for purposes of the parties’ cross-motions for summary judgment.
[8] Generally speaking, the Marijuana Act “encourage[s] the full participation in the commonwealth’s regulated marijuana industry of entrepreneurs from communities that have been disproportionately harmed by marijuana prohibition and enforcement,” G.L. c. 94G, § 14(a), by, inter alia, providing grants and loans to “economic empowerment priority applicants.” I d.
                                                            -8-
 
under the terms provided herein that is reasonably related to the costs imposed upon the City by the operation of the Company’s Marijuana Establishment.
1. The Company shall make annual host community payments of three percent (3%) of the gross sales of the Marijuana Establishment to the Municipality (the “Annual Payment”) for a period of five (5) years. The initial Annual Payment shall be due twelve (12) months after the issuance of a Final Certificate of Registration or its equivalent (the “Initial Payment”), and each subsequent Annual Payment shall be due on the anniversary date of the Initial Payment.
2. The Annual Community Impact Fee shall be paid quarterly per the City’s fiscal year (July 1-June 30). The Annual Community Impact Fee for the first quarter of operation shall be prorated.
3. The City shall use the above referenced payments in its sole discretion but shall make a good faith effort to allocate said payments to off-set costs related to road and other infrastructure systems, law enforcement, fire protection services, inspectional services, public health and addiction services and permitting and consulting services, as well unforeseen impacts upon the City.
4. The Company agrees to provide an additional annual payment of: The Sum of Twenty-Five Thousand Dollars ($25,000) to be made in agreement with the city as follows: One third to Emmaus House, one third to Haverhill Boys and Girls Club and one third to a charity chosen by the City.
5. P ayments: The Company shall make the payments set forth above in this Section of this Agreement made payable to the Municipality. The parties understand and acknowledge that the Municipality is under no obligation to use the payments described in this Section in any particular manner, provided, however, that the payments are reasonably related to the costs imposed upon the Municipality by the operation of the Marijuana Establishment.
Ex. 30, HCA at Art. II(A) (emphasis added).
 
                                                            -9-
 
            The parties’ HCA also includes a section entitled, “Annual Reporting for Host Community Impact Fees and Benefit Payments,” which grants the City broad access to Stem’s financial records. See id. at Art. II(C). That section also requires that the City and Stem review the CIF “every twelve (12) months to verify that the Annual Payment is reasonably related to the costs imposed upon the Municipality by the operation of the Marijuana Establishment.” I d. at Art. II(C)(2) (emphasis added).
PROCEDURAL HISTORY
            Stem filed its “Complaint for Mandamus, Injunction, Declaratory Judgment, and Damages” (Paper No. 1) (“Complaint”) on April 2, 2021, alleging six counts, four of which remain.[9]
            The remaining counts of the Complaint are: Count III, in which Stem seeks a declaratory judgment regarding various aspects of the City’s assessment of the CIF under the HCA;[10] Count IV, in which Stem alleges that the City breached the HCA by failing to produce proper documentation to support the CIF, and by assessing a fee not supported by documentation of anticipated or actual costs resulting from Stem’s operation; Count V, in which Stem alleges that the City breached the HCA’s implied
 
--------------------------------------------
 
[9] The Court (Howe, J.) previously dismissed Counts I (mandamus) and II (injunctive relief), which sought court orders: (1) requiring the City to produce the documentation of any cost imposed by the operation of Stem, as required by the HCA and G.L. c. 94G; and, (2) requiring Stem to pay into the court the CIF payment and enjoining the City from using the funds until the City produced documentation supporting the costs.
[10] More specifically, in Count III of the Complaint, Stem seeks a declaration that: (a) the City has failed to produce documentation of any costs imposed by Stem’s operation; (b) in the absence of such documentation the City has failed to assess a CIF that is “reasonably related” to anticipated or actual costs resulting from Stem’s operation (in contravention of the HCA and Section 3(d) of the Marijuana Act); (c) the City has not incurred and will not incur any such costs; (d) the CIF is improperly assessed; (e) the City is not entitled to any CIF from Stem; (f) any funds deposited paid by Stem as a CIF are to be returned with interest; and, (g) Stem is entitled to recover the costs and expenses of this action, including attorney’s fees.
 
                                                            -10-
 
covenant of good faith and fair dealing; and, Count VI, in which Stem seeks a declaration that it is not required to indemnify the City for attorneys’ fees incurred by the City in connection with Stem obtaining a special permit, and in defending a lawsuit brought by Stem in the Land Court challenging an amendment to the City’s zoning ordinance restricting where marijuana establishments may be located.
            After the Court (Lang, J.) denied Stem’s motion seeking an injunctive order permitting it to deposit its initial CIF with the court, Stem paid $358,942.53 to the City, on May 27, 2021, for its initial annual CIF under the HCA.
            On or about May 27, 2022, Stem paid $328,568.35 to the City for its second annual CIF under the HCA.[11]
            On October 24, 2022, Stem filed a motion for summary judgment on its remaining claims. Following a hearing, the Court (Lang, J.) denied the motion on November 28, 2022, concluding, among other things, that G.L. c. 94G and the HCA are both ambiguous with respect to what type of documentation must be provided to satisfy the “reasonable relationship” requirement for the CIFs, thus presenting a factual question. See Memorandum of Decision and Order on Plaintiff’s Motion for Summary Judgment (Paper No. 22) (“First S/J Decision”). While Judge Lang described the City’s efforts to justify the nearly $700,000 in CIFs paid in a two-year period as “somewhat anemic,” he declined to rule as a matter of law that the documentation the City had produced to date was so deficient that it amounted to either a breach of the HCA or a
 
--------------------------------------------
 
[11] At the hearing on the cross-motions, the parties reported that Stem paid its third annual CIF in May 2023, and that the fourth annual CIF would be due and payable in May 2024. The amount of these payments is immaterial to the Court’s decision.
 
                                                            -11-
 
breach of the implied covenant of good faith and fair dealing, concluding that those were questions to be decided by the factfinder at trial. Id.
            On September 20, 2023, the parties were before this Court for a scheduled Daubert-Lanigan hearing on the parties’ designated experts. The Court discussed with the parties a number of issues of law that should be addressed by the Court prior to trial, particularly related to the retroactive effect on the parties’ respective rights and obligations under the HCA as the result of the amendments to G.L. c. 94G in the 2022 Act, and the CCC’s then-anticipated amendments to its regulations.[12]
            On October 18, 2023, the Court endorsed the parties’ “Joint Statement of Issues Framed for Summary Judgment” (Paper No. 30), which sets forth the five agreed upon issues of law that are addressed in the parties’ cross-motions for summary judgment now before the Court. See Paper Nos. 32 and 33.
            The Court will now address these issues of law.
 
--------------------------------------------
 
[12] The 2022 Act, which amended G.L. c. 94G, required that the CCC adopt and/or revise regulations within one year of the effective date of the Act. The CCC issued revised regulations on September 23, 2023.
 
                                                            -12-
 
DISCUSSION[13]
I. THE 2022 ACT’S AMENDMENTS TO SECTION 3(d) OF THE MARIJUANA ACT THAT BECAME EFFECTIVE ON NOVEMBER 9, 2022, AND THE RESULTING AMENDMENTS TO THE CCC’s REGULATIONS THAT WERE ISSUED ON SEPTEMBER 23, 2023, DO NOT GOVERN THE PARTIES’ 2018 HCA
            Issue No. 1, as jointly framed by the parties for the Court’s consideration, is as follows:
Issue No. 1: Does Chapter 180 of the Acts of 2022, “An Act Relative to Equity in the Cannabis Industry” (“[2022] Act”), which amends G.L. c. 94G, §3(d), and the revised regulations adopted by the Cannabis Control Commission (935 CMR 500 et seq.) on September 23, 2023 to implement and enforce the [2022] Act, apply retroactively to the HCA entered into between Stem and the City of Haverhill, dated December 28, 2018, and if so, to what year or dates that the HCA has been in existence?
            Stem argues that the 2022 amendments to section 3(d) of the Marijuana Act and the resulting 2023 revisions by the CCC to the regulations should be applied retroactively to the parties’ 2018 HSA. The City disagrees.
            The Court concludes that the 2022 Act, which amended G.L. c. 94G, § 3(d), and the mandated revised regulations adopted by the CCC at 935 CMR 500 et seq., do not apply retroactively to the HCA entered into between Stem and the City in December 2018, and that the HCA and the conduct at issue in this dispute are governed by the language of G.L. c. 94G and 935 CMR 500 et seq. in effect at that time.
 
--------------------------------------------
 
[13] “‘[S]tatutory interpretation is a question of law for the court to decide,’ Annese Elec. Servs., Inc. v. Newton, 431 Mass. 763, 764 n.2 (2000), and can be appropriately resolved by summary judgment if there is no real dispute as to the salient facts, Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976).” Molly A. v. Commissioner of the Dep’t of Mental Retardation, 69 Mass. App. Ct. 267, 277 (2007). The parties agree that the five jointly framed legal issues are appropriately resolved at summary judgment.
 
                                                            -13-
 
            A party arguing in favor of retroactivity, such as Stem, faces an uphill battle, as the law is well-settled in Massachusetts that, “[a]bsent a clear indication of legislative intent, a statute presumptively operates prospectively only.” In re the Estate of Mason,
493 Mass. 148, 167 (2023).
As the SJC has long observed:
Whether a statute applies to events occurring prior to the date on which the statute takes effect is in the first instance a question of legislative intent If “the language of a statute is plain and
unambiguous, it is conclusive as to legislative intent.” Where there is no express legislative directive, th[e SJC] generally applies the rule of interpretation that statutes operate prospectively . . . .Nevertheless, a statute will be applied retroactively if “it appears by necessary implication from the words, context or objects of [the amendments] that the Legislature intended [them] to be retroactive in operation” and the retroactive intention is “unequivocally clear.”
Sliney v. Previte, 473 Mass. 283, 288 (2015) (citations and quotations omitted) 
(emphasis added).
            To be sure, “‘[i]t is only statutes regulating practice, procedure and evidence, in short, those relating to remedies and not affecting substantive rights, that commonly are treated as operating retrospectively, and as applying to pending actions or causes of action.’” White v. Hartigan, 464 Mass. 400, 422 (2013) (citations omitted); see also Hanscom v. Malden & Melrose Gaslight Co., 220 Mass. 1, 3 (1914) (“Doubtless all legislation commonly looks to the future, not to the past, and has no retroactive effect unless manifestly required by unequivocal terms. It is only statutes regulating practice, procedure and evidence, in short, those relating to remedies and not affecting substantive rights, that commonly are treated as operating retroactively, and as applying to pending actions or causes of action.”).
 
                                                            -14-
 
            Here, several factors point to prospective application of the 2022 amendments to G.L. c. 94G, § 3. First, nothing in the 2022 Act expressly provides for retroactive application of the new statutory requirements to HCAs entered into prior to the effective date of the amendments, i.e., November 9, 2022.
            The absence of express language in the 2022 Act regarding retroactivity is rendered even more meaningful by the fact that, in the 2022 Act, the Legislature explicitly made other contemporaneous amendments to the statutory scheme retroactive. See Section 29 of Chapter 180 of the Acts of 2022 (“Sections 1 and 2 shall take effect for taxable years beginning on or after January 1, 2022.”). Had the Legislature intended that the amendments to G.L. c. 94G, § 3(d), have retroactive effect, it could have said so, as it did elsewhere. In short, there is “‘no express legislative directive,’” Sliney, 473 Mass. at 288, and there are no “unequivocal terms” that manifestly require retroactive effect of the 2022 Act to the parties’ 2018 HCA. Hanscom, 220 Mass. at 3.
            In addition, the Court agrees with the City’s argument that the 2022 amendments to § 3(d)(3) can only be read as applying to new HCAs submitted to the CCC for review after November 9, 2022, because for the first time, the Legislature has required the CCC to review and approve HCAs, by adopting the following new provision:
The [CCC] shall review and approve each [HCA] as part of a completed marijuana establishment . . . license application and at each license renewal          The [CCC] shall not approve a final license application unless the [CCC] approves the [HCA] and certifies that the [HCA] complies with this subsection.
G.L. c. c. 94G, § 3(d)(3) (eff. November 9, 2022) (emphasis added).
 
                                                            15-
 
            “Final license” is the CCC’s term for an initial (as opposed to renewal) license. See 935 CMR 500.002 (“License means the certificate issued by the Commission that confirms that a Marijuana Establishment . . . has met all applicable [statutory] requirements . . . . A Marijuana Establishment . . . may hold a provisional or final License.” “Provisional Marijuana Establishment License means a License issued by the Commission confirming that a Marijuana Establishment has completed the application process and satisfied the qualifications for initial licensure.”); 500.103(1)-(2) (setting forth requirements for issuance of “provisional license” and “final license”).
            Thus, as a simple matter of statutory construction, if the CCC is required by the 2022 Act to “review and approve each [HCA] as part of a completed marijuana establishment . . . license application,” G.L. c. c. 94G, § 3(d)(3) (eff. November 9, 2022), and that same subsection requires that the CCC “shall not approve a final license application unless the [CCC] approves the [HCA] and certifies that the [HCA] complies with this subsection,” id., it follows that the CCC’s review of the HCA “at each license renewal,” id., applies to only those license applications approved after November 9, 2022.
            Moreover, the 2022 amendments to § 3(d) affect substantive rights, unlike those regulating practice and procedure “that commonly are treated as operating retrospectively.” White, 464 Mass. at 422. In particular, the 2022 amendments to section 3(d) provide that a CIF “shall . . . not mandate a certain percentage of total or gross sales as the community impact fee,” G.L. c. 94G, § 3(d)(2)(I) (eff. November 9, 2022), and shall not be effective longer than eight years. Id. at § 3(d)(2)(i)(C) (eff. November 9, 2022). The previous version of the statute included no such prohibition, instead
 
                                                            -16-
providing only that the CIF “shall not amount to more than 3 percent of the gross sales of the marijuana establishment . . . or be effective for longer than 5 years.” Id. at § 3(d)
(eff. until November 8, 2022).
            Here, the HCA, which was negotiated by the City and Stem in 2018, presumably in reliance on the HCA requirements and the CIF limits then in effect under G.L. c. 94G, § 3(d), provides for a CIF of three percent of Stem’s gross sales for a period of five years. Retroactive application of the 2022 amendments to § 3(d) would render that provision of the parties’ HCA unenforceable, thus affecting the substantive rights of the parties. See Fleet Nat’l Bank v. Commissioner of Revenue, 448 Mass. 441, 450 (2007) (“A statutory amendment that extinguishes a substantive right only operates prospectively, absent an explicit pronouncement from the Legislature to the contrary.”); Hanscom, 220 Mass. at 3; Smith v. Massachusetts Bay Transp. Auth., 462 Mass. 370, 372 (2012) (court asks “whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense of ‘affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment,’ and, if so, [we] apply the presumption that such a retroactive effect was not intended by the Legislature.”) (citation omitted).
            Having concluded that the 2022 amendments to G.L. c. 94G, § 3(d), do not apply retroactively to the parties’ HCA, the Court likewise concludes that the CCC’s amendments to the regulations made to effectuate the 2022 statutory amendments do not apply retroactively to the parties’ HCA. To the extent language in the CCC’s revised regulations suggests that they are to apply retroactively to HCAs entered into prior to November 9, 2022, that would be in excess of the CCC’s authority. As an administrative
 
                                                            -17-
 
agency, the CCC has no authority to contradict what this Court has concluded is a legislative intent that the 2022 amendments to § 3(d) apply prospectively. While administrate agencies have broad authority to effectuate the purposes of their enabling legislation and courts generally accord substantial deference to their expertise and experience, “[w]hen an agency acts beyond the scope of authority conferred to it by statute, its actions are invalid and ultra vires.” Armstrong v. Secretary of Energy and Environmental Affairs, 490 Mass. 243, 247 (2022). As a result, the amendments to the regulations undertaken by the CCC to effectuate the 2022 amendments to G.L. c. 94G, § 3(d), do not apply retroactively to the parties’ HCA.
            For all these reasons, the Court concludes that the 2022 Act which amended G.L. c. 94G, § 3(d), and the revised regulations adopted by the CCC in September 2023 (935 CMR 500 et seq.), do not apply retroactively to the parties’ rights and obligations in the HCA entered into between Stem and the City in 2018.[14] Accordingly, as to Issue No. 1, the Stem Motion is DENIED and the City Motion is ALLOWED.
 
--------------------------------------------
 
[14] As the Court concludes that the 2022 Act has no retroactive effect on the parties’ HCA based on the plain language of the statutory amendments and the well-settled law disfavoring retroactivity, the Court need not reach the City’s arguments that retroactive application of the statutory amendments to HCAs that were entered into before November 9, 2022, would violate:
(1) the Contracts Clause to the United States Constitution; and, (2) the basic tenet of contract law that a “meeting of the minds” is required to establish valid contract formation.
 
                                                                        -18-
 
II. THE PROVISIONS OF SECTION 3(d) OF THE MARIJUANA ACT THAT WERE IN EFFECT BEFORE THE 2022 AMENDMENTS, WHICH T HE COURT HAS RULED APPLY TO THE PARTIES’ HCA, DO NOT REQUIRE THE CITY TO DOCUMENT THE “REASONABLY RELATED COSTS” AT ANY TIME PRIOR TO THE END OF THE FIVE YEAR PERIOD FOR ASSESSING CIFs UNDER THE STATUTE IN ORDER TO COLLECT ANNUAL CIFs FROM STEM DURING SAID FIVE YEAR PERIOD
Issue No. 2, as jointly framed by the parties for the Court’s consideration, is as follows: Issue No. 2: If the answer to [Issue No.] 1 is no for any years that the HCA has been in existence, do the provisions of G.L. c. 94G, §3(d), as they existed at the time the parties entered into their HCA, require that the City document the reasonably related costs imposed upon the City by Stem’s operation, at any time prior to the expiration of the 5 year period for community impact fees permitted under the statute and incorporated into the parties’ HCA, in order to collect such community impact fees from Stem?
            Stem argues that “the only reasonable interpretation of the original statute and its implementing regulations required the city to document the reasonably related costs at least annually.” Stem Motion, p. 2 (Paper No. 32). For its part, the City argues that the statute does not require that the documentation be provided at any specific interval. The Court disagrees with Stem, agrees with the City, and rules that the simple answer to this question is “no.”
            As pertinent here, the language of G.L. c. 94G, § 3(d), prior to the 2022 amendments leaves much to be desired when it comes to the manner in which the CIFs are to be administered in practice. As set forth above, the language in § 3(d) prior to the 2022 amendments requires that the CIF must be “reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment,” and simply provides that “[a]ny cost to a city or town imposed by the operation of a
 
                                                            -19-
 
marijuana establishment . . . shall be documented and considered a public record as defined by clause Twenty-sixth of section 7 of chapter 4.”
            At bottom, unlike the language of the 2022 Act, the language in § 3(d) prior to the 2022 amendments is silent as to the timing of when costs must be documented by the municipality when assessing CIFs. Unlike the 2022 amendments, there is nothing in the pre-2022 statute or relevant regulations that requires the City to document “reasonably related costs” at specific intervals (or at any time prior to the expiration of the five-year time limit for collecting CIFs), and nothing that conditions the City’s collection of CIFs from Stem on documentation of reasonably related costs during that time period.[15] The Court cannot read language into the statute that is not there. See Carmel Credit Union v . Bondeson, 55 Mass. App. Ct. 557, 560 (2002) (court interprets statute according to its plain words and will “not add words to a statute that the Legislature did not put there”).
            Therefore, the Court concludes that the provisions of Section 3(d) of the Marijuana Act that were in effect before the 2022 amendments, which the Court has ruled apply to the parties’ HCA, do not require the City to document the “reasonably related costs” imposed upon the City by Stem’s operation at any time prior to the expiration of the five year period for CIFs permitted under the statute and incorporated
 
--------------------------------------------
 
[15] The fact that CCC regulations in effect prior to the 2022 statutory amendments required a marijuana establishment to submit as a component of its renewal application proof that it had requested from the host community the records of any costs to the municipality reasonably related to the operation of the marijuana establishment and either the municipality’s substantive response or an attestation that no response was received, 935 CMR 500.103(4)(f), does not equate to a statutory requirement that the municipality produce such documentation on an annual basis in advance of the marijuana establishment’s renewal of its license. In fact, the Legislature apparently recognized this when it mandated in the 2022 Act that the municipality “transmit[ documentation] to the licensee not later than 1 month after the date of the annual renewal of a final license to operate.” G.L. c. 94G, § 3(d)(2)(iii) (eff. November 9, 2022).
 
                                                            -22-
 
into the parties’ HCA, in order to collect annual CIFs from Stem during said five year period.[16]
            Accordingly, as to Issue No. 2, the Stem Motion is DENIED and the City Motion is ALLOWED.
III.  THE PROVISIONS OF SECTION 3(d) OF THE MARIJUANA ACT THAT WERE IN EFFECT BEFORE THE 2022 AMENDMENTS DO NOT REQUIRE THAT THE CITY DOCUMENT THE “REASONABLY RELATED COSTS” IMPOSED UPON IT BY STEM’S OPERATION IN A NY PARTICULAR MANNER OR FORMAT WHEN ASSESSING THE CIF UNDER THE PARTIES’ HCA
Issue No. 3, as jointly framed by the parties for the Court’s consideration, is as follows:
Issue No. 3: If the answer to [Issue No.]1 is no for any years that the HCA has been existence, do the provisions of G.L. c. 94G, §3(d) as they existed at the time the parties entered into their HCA, or the HCA itself, require that the City document the reasonably related costs imposed upon the City by Stem’s operation, in any particular manner or format?
            Stem argues that “[t]he reasonably related costs must be documented as would be any other public record of a cost incurred by the municipality.” Stem Motion, p. 2 (Paper No. 32). On the other hand, the City argues that the pre-2022 version § 3(d) “contains no parameters or requirements as to the manner or format of the
 
--------------------------------------------
 
[16] The Court’s conclusion on Issue No. 2 relates only to the requirements of the provisions of G.L. c. 94G, §3(d), as they existed at the time the parties entered into their HCA, not the requirements of the parties’ HCA at Art. II(C)(2). As Judge Lang explained in the First S/J Decision, the provision in the parties’ HCA at Art. II(C)(2), which requires the parties to review the CIF “every twelve (12) months to verify that the Annual Payment is reasonably related to the costs imposed upon the Municipality by the operation of the Marijuana Establishment,” Ex. 30, HCA, Art. II(C)(2), when “[c]onstrued objectively, . . . reflects an agreement that the City would be providing some information or 
documentation on a yearly basis regarding Stem-related costs to the City.” First S/J Decision, p. 10 (Paper No. 22). The manner, type, and format of the documentation contemplated by the parties in Art. II(C)(2) of the their HCA are questions for the factfinder.
 
                                                            -21-
 
documentation of reasonably related costs.” Memorandum of Law in Support of City Motion, p. 21 (Paper No. 33.2). The Court disagrees with Stem, agrees with the City, and rules that the answer to this question is “no” with respect to the provisions of G.L. c. 94G, §3(d), as they existed at the time the parties entered into their HCA in 2018 (i.e., prior to the 2022 amendments to the Marijuana Act), which the Court has ruled apply to the parties’ HCA.
            In so answering this question, the Court turns to the plain language of G.L. c. 94G, § 3(d), prior to the 2022 amendments, which provides only that any costs imposed upon the City by Stem’s operation “shall be documented and considered a public record as defined by clause Twenty-sixth of section 7 of chapter 4.” G.L. c. 94G, § 3(d) (eff. until November 8, 2022).
            Clause twenty-sixth of G. L. c. 4, § 7, defines the term “public records” and sets forth a laundry list of exemptions; it does not include any provisions regarding the particular manner or format in which “public records” should be documented. Again, the Court declines to read into the statute language that is not there. See Carmel Credit Union, 55 Mass. App. Ct. at 560.
            With respect to the language in the parties’ HCA regarding documentation of the CIF, the answer is also “no.” Although the parties’ HCA requires that the City and Stem review the CIF “every twelve (12) months to verify that the Annual Payment is reasonably related to the costs imposed upon the Municipality by the operation of the Marijuana Establishment,” Ex. 30, HCA, Art. II(C)(2), as stated, Judge Lang noted in the First S/J Decision that this simply “reflects an agreement that the City would be providing some information or documentation on a yearly basis regarding Stem-related
 
                                                            -22-
 
costs to the City.” First S/J Decision, p. 10 (Paper No. 22). Nevertheless, the parties’ HCA is silent regarding any particular manner or format for the information or documentation. Therefore, the determination of what the parties intended in their HCA must be left for the factfinder.
            Accordingly, as to Issue No. 3, the Stem Motion is DENIED and the City Motion is ALLOWED.
 
IV.  THE DEFINITION OF THE TERM “REASONABLY RELATED” AS USED IN THE STATUTORY PHRASE, “REASONABLY RELATED TO THE COSTS IMPOSED UPON THE MUNICIPALITY BY THE OPERATION OF THE MARIJUANA ESTABLISHMENT…” IN §3(d) AND ADOPTED IN THE PARTIES’ HCA MEANS “CONNECTED TO A FAIR
OR MODERATE DEGREE”
            Issue No. 4, as jointly framed by the parties for the Court’s consideration, is as follows:
Issue No. 4: What is the definition of the term “reasonably related” as used in the statutory phrase, “reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment…” in G.L. c. 94G, §3(d)?
            As stated, both versions of G.L. c. 94G, §3(d), and the HCA require that the CIF “shall be reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment.” However, neither version of the statute, nor the CCC regulations in effect when Stem and the City entered into their HCA in 2018, defines the term “reasonably related.”[17]
 
--------------------------------------------
 
[17] As set forth above, the parties agreed in the HCA that, “in order to mitigate the financial impact on the City and use of City resources, the Company agrees to pay an Annual Community Impact Fee to the City, in the amount and under the terms provided herein that is reasonably related to the costs imposed upon the City by the operation of the Company’s Marijuana Establishment.” Ex. 30, HCA, Art. II(A). The parties also agreed that the City “is under no obligation to use the [CIF] payments . . . in any particular manner, provided, however, that the payments are reasonably related to the costs imposed upon the [City] by [Stem’s] operation
 
                                                            -23-
 
            Stem argues that the Court should adopt the definition of “reasonably related” promulgated by the CCC in the amended regulations it issued in September 2023, which were prompted by the 2022 amendments to G.L. c. 94G. That definition is as follows:
Reasonably Related means a demonstrable nexus between the actual operations of a Marijuana Establishment . . . and an enhanced need for a Host Community’s goods or services in order to offset the impact of operations. Fees customarily imposed on other non- marijuana businesses operating in a Host Community shall not be considered Reasonably Related.
935 CMR 500.002 (effective September 2023). However, the Court declines to adopt this definition because it was presumably drafted by the CCC with the 2022 Act’s myriad new constraints on CIFs in mind.
            Instead, in the absence of a statutory definition, the Court turns to the well-known rules of statutory interpretation, which the Supreme Judicial Court has summarized as follows:
“A fundamental tenet of statutory interpretation is that statutory language should be given effect consistent with its plain meaning and in light of the aim of the Legislature unless to do so would achieve an illogical result. . . . [Courts] ascertain such meaning ‘by the ordinary and approved usage of the language, considered in connection with the cause of [the statute’s] enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.’ . . . ‘Where possible, [courts should] seek to harmonize the provisions of a statute with related provisions that are part of the same statutory scheme so as to give full effect to the expressed intent of the Legislature.”
 
--------------------------------------------
 
of the Marijuana Establishment.” I d. at Art. II(A)(5). Nevertheless, the term “reasonably related” is not defined in the parties HCA.
 
                                                            -24-
 
Marengi v. 6 Forest Rd. LLC, 491 Mass. 19, 24-25 (2022) (citations omitted) (emphasis added); see also Cavanagh v. Cavanagh, 490 Mass. 398, 405 (2022) (“General Laws c. 4, §6, provides that, as a general rule, ‘[w]ords and phrases shall be construed according to the common and approved usage of the language.’”) (citation omitted); Worcester v. College Hill Props., LLC, 465 Mass. 134, 138 (2013) (“In interpreting the meaning of a statute, we look first to the plain statutory language.”). “‘[Courts] derive the words’ usual and accepted meanings from sources presumably known to the statute’s enactors, such as their use in other legal contexts and dictionary definitions.’” Williams v. . Board of Appeals of Norwell, 490 Mass. 684, 693 - 694 (2022) (citations omitted).
            Dictionaries define “reasonably” as “to a fair or moderate degree” and “in a fair or appropriate way.” https://www.britannica.com/dictionary/reasonably (The Britannica
Dictionary) (last accessed June 7, 2024). Dictionaries define “related” as “connected in some way” or “having relationship to or with something else,” Black's Law Dictionary (11th ed. 2019), or as “associated” or “connected.”
https://www.dictionary.com/browse/related (last accessed June 7, 2024).
            Based on these definitions, in the context of the statutory language at issue, and with the above-quoted rules of statutory construction in mind, the Court concludes that the term “reasonably related” as used in G.L. c. 94G, §3(d), and adopted by the parties in their HCA, means “connected to a fair or moderate degree.”
            The Court does not go so far as to conclude, as the City suggests, that the lengthy list of topics included in G.L. c. 94G, § 17, as part of the statutory directive for the CCC to establish a “research agenda,” are necessarily “reasonably related” costs.
 
                                                            -25-
 
            Section 17 directs the CCC to “develop a research agenda in order to understand the social and economic trends of marijuana in the commonwealth, to inform future decisions that would aid in the closure of the illicit marketplace and to inform the commission on the public health impacts of marijuana” and includes a non-exhaustive list of topics that should be included. Those topics include:
(i) patterns of use, methods of consumption, sources of purchase and general perceptions of marijuana among minors, among college and university students and among adults; (ii) incidents of impaired driving, hospitalization and use of other health care services related to marijuana use, including a report of the state of the science around identifying a quantifiable level of marijuana-induced impairment of motor vehicle operation and a report on the financial impacts on the state healthcare system of hospitalizations related to marijuana; (iii) economic and fiscal impacts for state and local governments including the impact of legalization on the production and distribution of marijuana in the illicit market and the costs and benefits to state and local revenue; (iv) ownership and employment trends in the marijuana industry examining participation by racial, ethnic and socioeconomic subgroups, including identification of barriers to participation in the industry; (v) a market analysis examining the expansion or contraction of the illicit marketplace and the expansion or contraction of the legal marketplace, including estimates and comparisons of pricing and product availability in both markets; (vi) a compilation of data on the number of incidents of discipline in schools, including suspensions or expulsions, resulting from marijuana use or possession of marijuana or marijuana products; and (vii) a compilation of data on the number of civil penalties, arrests, prosecutions, incarcerations and sanctions imposed for violations of chapter 94C for possession, distribution or trafficking of marijuana or marijuana products, including the age, race, gender, country of origin, state geographic region and average sanctions of the persons charged.
G.L. c. 94G, § 17(a).[18]
 
--------------------------------------------
 
[18] This subsection of § 17 was not amended by the 2022 Act.
 
                                                            -26-
 
            According to the City, “[m]arijuana use and abuse educational programming, substance abuse prevention and treatment programs, school studies as to perceptions regarding marijuana usage amongst youth, efforts to track and address increasing marijuana usage by students – all of these items represent costs ‘reasonably related’ to legalized marijuana.” (emphasis added).
            The Court disagrees with the City’s argument because costs that are reasonably related to the impact of legalized marijuana, in general, are not what G.L. c. 94G, § 3(d), requires with respect to CIFs. Rather, § 3(d) expressly requires that the CIF “shall be reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment,” G.L. c. 94G, § 3(d) (emphasis added), and not that the CIF shall be reasonably related to the costs imposed by legalized marijuana generally.
            Moreover, the City’s position that it is allowed to recoup costs imposed on it due to legalized marijuana, in general, via the assessment of the CIF is belied by language in the parties’ HCA regarding the rationale for the CIF, which states that:
The Company anticipates that the City will incur additional expenses and impacts on the City’s road and other infrastructure systems, law enforcement, fire protection services, inspectional services, and permitting and consulting services, as well as unforeseen impacts on the City. Accordingly, in order to mitigate the financial impact on the City and use of City resources, the Company agrees to pay an Annual Community Impact Fee to the City, in the amount and under the terms provided herein that is reasonably related to the costs imposed upon the City by the operation of the Company’s Marijuana Establishment.
Ex. 30, HCA, Art. II(A) (emphasis added).
 
                                                            -27-
 
            To be sure, the list of topics in G.L. c. 94G, § 17, is aimed at answering broader questions than what costs imposed on a municipality are reasonably related to a marijuana establishment’s operation, although there may be some overlap between the list of topics to be included in the CCC’s research agenda pursuant to Section 17 and the types of costs to the City that may be reasonably related to Stem’s operation.
            Accordingly, as to Issue No. 4, the Stem Motion is DENIED and the City Motion is DENIED.
V.  THE MEANING OF THE TERM “COSTS IMPOSED ON THE CITY BY T HE OPERATION OF HAVERHILL STEM’S BUSINESS” IN THE HCA, G .L. c. 94G, § 3(d), AND RELEVANT REGULATIONS MEANS ACTUAL COSTS IMPOSED ON THE CITY BY THE OPERATION OF STEM’S BUSINESS
            Issue No. 5, as jointly framed by the parties for the Court’s consideration, is as follows:
Issue No. 5: What is the meaning of: “costs imposed on the City by the operation of Haverhill Stem’s business” as used in the HCA, G.L. c. 94G, § 3(d), and relevant regulations?
            Stem contends that the phrase “costs imposed on the City by the operation of Haverhill Stem’s business,” as used in Art. II(A) of the parties HCA, and the corresponding statutory language in § 3(d), “costs imposed upon the municipality by the operation of [Stem’s] marijuana establishment,” means that the CIF “can only be supported by actual expenses incurred by the City, which fall outside the usual expenses of city administration, and which are unique to the marijuana establishment and not common to any other business in the city.”19 Stem’s Motion, p. 3 (Paper No. 32).
 
--------------------------------------------
 
[19] While Stem points the Court to the CCC’s revised regulations in support of its interpretation, the argument is unpersuasive where the Court has already ruled that the revised regulations,
 
                                                            -28-
 
            The City, meanwhile, construes the phrase broadly, contending it ought to be read to include a proportional share, along with the other marijuana establishments operating within the City, of its overall related expenditures, referring back to the aforementioned list of research agenda topics included in G.L. c. 94G, § 17.
            The Court concludes that the answer lies somewhere in between the parties’ respective positions.
            Turning first to the meaning of “costs” as used in the phrase at issue, the Court concludes that the term refers to actual costs imposed on the City, and not anticipated, expected, or hypothetical costs. The Legislature used the word “costs,” not “anticipated costs” or “expected costs,” and the Court interprets that word according to the same rules of statutory interpretation quoted above in its answer to Issue No. 4.
            According to the same sources cited by the City in defining “reasonably related,” dictionaries define “costs” as follows: “the price of something,” “the amount of money that is needed to pay for or buy something,” or “an amount of money that must be spent regularly to pay for something,” https://www.britannica.com/dictionary/cost (The Brittanica Dictionary) (last accessed June 7, 2024); and, “the price paid to acquire, produce, accomplish, or maintain anything” or “an outlay or expenditure of money, time, labor, trouble, etc.” https://www.dictionary.com/browse/cost (last accessed June 7, 2024).
 
--------------------------------------------
 
which were presumably drafted with the statutory amendments’ new constraints on CIFs in mind, are inapplicable to this case.
 
                                                            -29-
 
            Furthermore, in the Court’s view, the Legislature’s use of the word “imposed” is significant to the conclusion that “costs” refers to actual costs to the City.
Dictionaries define “impose” as follows: “to cause (something, such as a tax, fine, rule, or punishment) to affect someone or something by using your authority,” “to establish or create (something unwanted) in a forceful or harmful way,” or “to force someone to accept (something or yourself),” https://www.britannica.com/dictionary/impose (The Britannica Dictionary) (last accessed June 7, 2024); and, “to lay on or set as something to be borne, endured, obeyed, fulfilled, paid, etc.,” or “to put or set by or as if by authority.” https://www.dictionary.com/browse/impose (last accessed June 7, 2024).
            All of these definitions of “impose” imply that a cost “imposed” on the City by the operation of Stem’s business is one put on the City by some existing outside force. Thus, reading the word “costs” in the context of the phrase “costs imposed,” the Court concludes that “costs” refers to actual costs imposed on the City.
            Turning to the remainder of the phrase, “costs imposed upon the municipality by the operation of the marijuana establishment,” as stated in the Court’s answer to Issue No. 4, the Court does not read the phrase as meaning costs imposed upon the City by legalized marijuana generally. The Legislature used the words “by the operation of the marijuana establishment” and the Court, once again, interprets them according to the same rules of statutory interpretation quoted above in its answer to Issue No. 4.
            The pre-November 9, 2022, version of G.L. c. 94G, § 3(d), uses the term “marijuana establishment” to refer to a particular marijuana establishment entering into an HCA with a municipality, not to marijuana establishments collectively or generally. In
 
                                                            -30-
 
this context, the plain meaning of “by the operation of the marijuana establishment” is “by the operation of the particular marijuana establishment with which the municipality has the HCA.”
            This Court’s interpretation does not foreclose the City from arguing that certain “costs imposed upon the municipality by the operation of the marijuana establishment” may be determined by calculating Stem’s proportional share of a cost imposed upon the City by the collective operation of all of the marijuana establishments operating within it. The Court recognizes that it may sometimes be difficult to establish conclusively that a cost to the City resulting from legalized recreational marijuana use was caused by one particular marijuana establishment rather than another. It will be up to the factfinder to determine whether any such costs have been demonstrated to be “reasonably related” to the costs imposed upon the City by Stem’s operation.
            For the foregoing reasons, the Court concludes that “costs imposed on the City by the operation of Haverhill Stem’s business,” as used in the parties’ HCA and the corresponding statutory language, “costs imposed upon the municipality by the operation of the marijuana establishment,” mean “actual costs imposed on the City by the operation of Stem’s business.”
            Accordingly, as to Issue No. 5, the Stem Motion is DENIED and the City Motion is DENIED.
ORDER
            For the above reasons, it is HEREBY ORDERED that:
            1. Plaintiff’s Motion For Summary Judgment On Statement Of Framed Issues Pursuant To The Court’s Endorsement Dated October 18, 2023 (Paper No. 32) is DENIED as to Issues Framed for Summary Judgment Nos. 1 through 5.
 
                                                            -31-
 
            2. Defendant’s Motion For Summary Judgment On Court-Endorsed Legal Issues (Paper No. 33.1) is ALLOWED as to Issues Framed for Summary Judgment Nos. 1 through 3, and DENIED as to Issues Framed for Summary Judgment Nos. 4 and 5.
            3. The Court HEREBY DECLARES and ADJUDGES that:
            a. Chapter 180 of the Acts of 2022, “An Act Relative to Equity in the Cannabis Industry” (“2022 Act”), which amended G.L. c. 94G, §3(d), and became effective on November 9, 2022; and, the resulting amendments to the regulations at 935 CMR 500, et seq., that were issued on September 23, 2023, by the Cannabis Control Commission do not retroactively govern the parties’ rights and obligations under their Host Community Agreement, dated December 28, 2018.
            b. The provisions of G.L. c. 94G, § 3(d) that were in effect before the amendments in the 2022 Act, do not require that the City of Haverhill document the reasonably related costs imposed upon the City by Haverhill Stem LLC’s operation at any time prior to the expiration of the five year period for assessing Community Impact Fees (“CIF”) under the statute (and incorporated into the parties’ HCA) in order to collect annual CIFs from Haverhill Stem LLC.
            c. Neither the provisions of G.L. c. 94G, §3(d), that were in effect before the amendments in the 2022 Act, nor the parties’ HCA itself, require that the City document the reasonably related costs imposed upon the City by Haverhill Stem LLC’s operation in any particular manner or format.
            d. The term “reasonably related” as used in the statutory phrase, “reasonably related to the costs imposed upon the municipality by the operation of the marijuana establishment…” in G.L. c. 94G, §3(d), before the amendments in the 2022 Act, and used by the parties in Art. II(A) and Art. II(A)(5) of their HCA, means “connected to a fair or moderate degree.”
            e. The phrases “costs imposed on the City by the operation of Haverhill Stem’s business” as used in the parties’ HCA at Art. II(A) and Art. II(A)(5); and, “costs imposed upon the municipality by the operation of the marijuana establishment,” in G.L. c. 94G, § 3(d), before the amendments in the 2022 Act (and in relevant regulations), mean “actual costs imposed on the City by the operation of Haverhill Stem LLC’s business.”